**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Civil Action No.: 3:24-cv-00382-KDB-SCR**

JULIE ROBERTS and JUDITH SIGMON, *individually and on behalf of all others similarly situated*,

Plaintiffs,

vs.

THE CHARLOTTE-MECKLENBURG HOSPITAL AUTHORITY (d/b/a ATRIUM HEALTH),

Defendant.

**DEFENDANT CMHA'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) AND PARTIAL MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**

## TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ..... i

INTRODUCTION ..... 1

STATEMENT OF FACTUAL RECORD FOR PURPOSES OF THIS MOTION ..... 5

A. CMHA's Web Properties, the use of pixels, and Plaintiffs' specific allegations ..... 5

B. The use of tracking technologies and HHS' issuance of the Original Bulletin and the Revised Bulletin ..... 7

C. The nature of Plaintiffs' proposed class ..... 9

D. The nature of Plaintiffs' claims ..... 10

LEGAL STANDARD ..... 11

ARGUMENT ..... 12

I. Federal jurisdiction is not supported by CAFA ..... 12

A. The Court should decline CAFA jurisdiction under the mandatory local controversy exception to CAFA ..... 12

B. The Court should decline CAFA jurisdiction under the discretionary local controversy exception to CAFA ..... 16

II. Plaintiffs' ECPA claim should be dismissed pursuant to Rule 12(b)(6) ..... 18

III. The Court should decline to exercise supplemental jurisdiction over the remaining state-law claims ..... 22

IV. Even if the Court retains jurisdiction over the Plaintiffs' unjust-enrichment claim, it should be dismissed ..... 24

CONCLUSION ..... 25

ARTIFICIAL INTELLIGENCE CERTIFICATION ..... 27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Novant Health*,
No. 1:22-CV-697, 2023 WL 5486240 (M.D.N.C. Aug. 24, 2023) .................. 4, 21, 25

*Am. Hosp. Ass'n v. Becerra*,
No. 4:23-cv-1110, 2024 WL 3075865 (N.D. Tex. June 20, 2024) ...................... 2, 8, 9

*Arrington v. City of Raleigh*,
369 F. App'x 420 (4th Cir. 2010) .................................................................. 23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................... 12

*Aziz v. Alcolac, Inc.*,
658 F.3d 388 (4th Cir. 2011) ......................................................................... 12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................................... 12

*Carolina Destinations, LLC v. Iredell Cnty.*,
No. 5:24-CV-00003-KDB-DCK, 2024 WL 775170 (W.D.N.C. Feb. 26, 2024) ........................................................................................................ 24

*Cook v. S.C. Pub. Serv. Auth.*,
No. 6:19-CV-03285-TLW, 2020 WL 869741 (D.S.C. Jan. 21, 2020) .......... 13, 14, 18

*Expert Bus. Sys., LLC v. BI4CE, Inc.*,
233 F. App'x 251 (4th Cir. 2007) .................................................................. 19

*Goldberg v. Skyline Tower Painting Inc.*,
No. 1:23-CV-01708-JRR, 2024 WL 1050942 (D. Md. Mar. 10, 2024) ..................... 14

*Henderson v. Harmon*,
102 F.4th 242 (4th Cir. 2024) ....................................................................... 22

*Hinson v. Norwest Fin. S.C., Inc.*,
239 F.3d 611 (4th Cir. 2001) ......................................................................... 22

*Holden v. Carolina Payday Loans, Inc.*,
No. 4:08-182-TLW-TER, 2008 WL 4198587 (D.S.C. Sept. 5, 2008) ....................... 12

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
806 F.3d 125 (3d Cir. 2015) ................................................................ 19, 20, 21

**Page(s)**

*Kerns v. United States*,
585 F.3d 187 (4th Cir. 2009) ........ 11

*L. v. Priority Tr. Servs. of N.C., L.L.C.*,
No. 3:08-CV-103, 2008 WL 3539512 (W.D.N.C. Aug. 11, 2008) ........ 11

*Regency Ctrs. Acquisition, LLC v. Crescent Acquisitions, LLC*,
No. 17 CVS 11354, 2018 WL 562749 (N.C. Super. Ct. Jan. 24, 2018) ........ 24

*Rorie v. The Charlotte-Mecklenburg Hosp. Auth.*,
Case No. 23-CVS-6166 (N.C. Super. Ct. Apr. 4, 2023) ........ 18

*Scott v. Cricket Comm'ns, LLC*
865 F.3d 189 (4th Cir. 2017) ........ 13

*Shanaghan v. Cahill*,
58 F.3d 106 (4th Cir. 1995) ........ 22

*Simpson v. StoneMor GP, LLC*,
No. 3:23-CV-00217-KDB-SCR, 2024 WL 1340561 (W.D.N.C. Mar. 28, 2024) ........ 24

*Smith v. Pollino*,
No. 3:19-CV-00639-KDB-DCK, 2020 WL 2104947 (W.D.N.C. May 1, 2020) ........ 24

*Weddle v. WakeMed Health and Hosps.*,
No. 22 CVS 13860, 2023 WL 8369786 (N.C. Super. Ct. Dec. 4, 2023) ........ 24, 25

*Williams v. DukeHealth*, No. 1:22-CV-727, 2024 WL 898051 (M.D.N.C. Mar. 1, 2024), *report and recommendation adopted sub nom. Naugle v. Duke Univ. Health Sys., Inc.*, No. 1:22-CV-727, 2024 WL 1307216 (M.D.N.C. Mar. 27, 2024) ........ 4, 12, 21

**Statutes**

18 U.S.C. § 2510 ........ 4

28 U.S.C. § 1331 ........ 4, 18

28 U.S.C. § 1332(c) ........ 3

28 U.S.C. § 1332(d) ........ 3, 12

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

28 U.S.C. § 1332(d)(3) .......... 14, 16-18

28 U.S.C. § 1332(d)(4) .......... 3, 13, 16

28 U.S.C. § 1367 .......... 4, 22

**Rule**

Fed. R. Civ. P. Rule 12(b)(1) .......... 11, 25

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Civil Action No.: 3:24-cv-00382-KDB-SCR**

| | |
|---|---|
| JULIE ROBERTS and JUDITH SIGMON, *individually and on behalf of all others similarly situated*,<br><br>Plaintiffs,<br><br>vs.<br><br>THE CHARLOTTE-MECKLENBURG HOSPITAL AUTHORITY (d/b/a ATRIUM HEALTH),<br><br>Defendant. | **DEFENDANT CMHA'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) AND PARTIAL MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)** |

## INTRODUCTION

This lawsuit was brought by two plaintiffs who assert a handful of North Carolina common-law claims and one federal statutory claim. Plaintiffs contend that these claims arise from the use by The Charlotte-Mecklenburg Hospital Authority d/b/a Atrium Health ("**CMHA**") of commonplace marketing tools and technology on its websites and, in particular, a "pixel" technology provided by Meta Platform Inc. ("**Meta**," previously Facebook) called the Meta Pixel. Plaintiffs allege that they were harmed because their browsing of CMHA's website, which used this technology, supposedly led them to receive unwanted advertisements.

Plaintiffs principally assert that CMHA used this technology on its website through October 2022 and that this use violated North Carolina law because state common-law claims should incorporate guidance issued by the U.S. Department of Health and Human Services Office of Civil Rights ("**HHS**") in December 2022 (the

"**Original Bulletin**")[1] and updated in March 2024 and June 2024 (the "**Revised Bulletin**").[2] Second Am. Compl. ¶¶ 1, 129, 135, 144, 146 (hereinafter "**Compl.**"). Plaintiffs do not allege that CMHA used tracking technology after the Original or Revised Bulletins were issued, but contend that the Court should apply the principles of the Bulletins to Plaintiffs' state-law claims retrospectively. *See* Compl. ¶¶ 124-25, 134-46.

After Plaintiffs filed this action, but before they filed their Second Amended Complaint, the U.S. District Court for the Northern District of Texas vacated portions of the Revised Bulletin. That court held that the Revised Bulletin constituted agency rulemaking subject to judicial review, and, upon that court's review, vacated the Bulletins to the extent they concluded that the use of an individual's IP address in the context of unauthenticated websites constituted the use of protected health information restricted by the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**"). *Am. Hosp. Ass'n v. Becerra*, No. 4:23-cv-1110, 2024 WL 3075865 at *7, 11 (N.D. Tex. June 20, 2024).

---

[1] *See* Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (Dec. 1, 2022), attached as **Exhibit 1**.

[2] *See* Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (Mar. 18, 2024 & updated June 26, 2024), attached as **Exhibit 2**. The June 2024 update to the Bulletin states, in relevant part, "[o]n June 20, 2024, the U.S. District Court for the Northern District of Texas issued an order declaring unlawful and vacating a portion of this guidance document."

CMHA's Motion does not ask the Court to assess the soundness of Plaintiffs' theory. Rather, the foregoing illustrates that, but for Plaintiffs' single federal statutory claim, their claims raise novel issues of state law; namely, how and to what extent the partially vacated Revised Bulletin substantively impacts claims brought under North Carolina common law.

The focus of this Motion is jurisdictional. Plaintiffs expressly assert that federal jurisdiction is grounded in diversity jurisdiction by virtue of the Class Action Fairness Act ("**CAFA**"), 28 U.S.C. § 1332(d). Compl. ¶ 42. But as set forth below, more than two-thirds of Plaintiffs' proposed class members are citizens of North Carolina. Although CAFA permits this Court to exercise diversity jurisdiction in class actions where there is not complete diversity between plaintiff class members and defendants, CAFA instructs the Court to decline jurisdiction under the "mandatory local controversy exception" to CAFA, i.e., where more than two-thirds of class members are citizens of the same state as the primary defendant and the action is filed in that state. 28 U.S.C. § 1332(d)(4)(B). Because the mandatory local controversy exception applies to this case, CAFA does not support federal jurisdiction. 28 U.S.C. § 1332(d)(4)(B). Alternatively, if the Court does not conclude that more than two-thirds of the proposed class are citizens of North Carolina, by applying the factors of the discretionary local controversy exception to CAFA, the Court may decline CAFA jurisdiction because more than one-third but less than two-thirds of class members are citizens of North Carolina. 28 U.S.C. § 1332(c).

Additionally, although Plaintiffs' Complaint does not expressly invoke federal-question jurisdiction, it asserts a claim under the federal Electronic Communications Privacy Act ("**ECPA**"), 18 U.S.C. § 2510, *et seq*. Plaintiffs may contend that this claim supports federal jurisdiction pursuant to 28 U.S.C. § 1331. This Court, however, should follow the decisions of other federal courts that have dismissed ECPA claims based on allegations of pixel use by health care providers. *E.g.*, *Williams v. DukeHealth*, No. 1:22-CV-727, 2024 WL 898051, at *8-9 (M.D.N.C. Mar. 1, 2024) (dismissing ECPA claim in Meta Pixel case), *report and recommendation adopted sub nom. Naugle v. Duke Univ. Health Sys., Inc.*, No. 1:22-CV-727, 2024 WL 1307216 (M.D.N.C. Mar. 27, 2024); *Allen v. Novant Health*, No. 1:22-CV-697, 2023 WL 5486240, at *4 (M.D.N.C. Aug. 24, 2023) (same).

Upon such a dismissal, this action would lack a claim to support federal-question jurisdiction. *See Williams*, 2024 WL 898051, at *11-12 (requiring plaintiff to address basis for CAFA jurisdiction upon dismissal of federal ECPA claim). In that circumstance, the Court should also decline supplemental jurisdiction over Plaintiffs' remaining state-law claims because those claims present novel issues of state law. *See* 28 U.S.C. § 1367(c).

Finally, if the Court decides to exercise jurisdiction over Plaintiffs' state-law claims, it should dismiss Plaintiffs' state-law unjust-enrichment claim for failing to state a claim pursuant to Rule 12(b)(6).

## STATEMENT OF FACTUAL RECORD FOR PURPOSES OF THIS MOTION[3]

### A. CMHA's Web Properties, the use of pixels, and Plaintiffs' specific allegations

CMHA is a hospital authority incorporated in North Carolina, and headquartered in Charlotte, North Carolina. Compl. ¶ 47; Declaration of Lakesha Holloway ¶ 4 (hereinafter "Holloway Decl."). For the period relevant to Plaintiffs' Complaint, CMHA operated numerous hospitals, emergency departments, and physician practices primarily located in the state of North Carolina, with a substantial concentration of those services in Charlotte and its surrounding counties. Compl. ¶ 2; Holloway Decl. ¶ 7.

Like most health care providers, CMHA operates a public website, atriumhealth.org, through which it provides a means for the public to obtain information about the health care services that CMHA offers. Compl. ¶ 3; Holloway Decl. ¶ 5. The website provides information about the nature of those services, the kind of health care specialty services CMHA offers, the location and nature of CMHA's facilities, and information about physicians and other individuals who provide patient care. Compl. ¶¶ 3, 16, 37; *see also* Holloway Decl. ¶ 5. Although the nature of CMHA's website has changed over time, some features of the public website include the ability for users to make an appointment with a physician or other provider, Compl. ¶ 37, and to search the website for information about health

[3] This statement of facts includes assertions made by Plaintiffs in the Complaint as well as facts set forth in the Declarations of Lakesha Holloway and Mark Rhodes provided in support of CMHA's Motion made pursuant to Fed. R. Civ. P. 12(b)(1).

care services through a search bar, *id.* ¶ 12. CMHA's website has also included a patient portal, "MyAtriumHealth," where patients may access their health records. *Id.* ¶¶ 62, 115; Holloway Decl. ¶ 6. Plaintiffs define CMHA's website, "atriumhealth.org," and the related patient portal, "MyAtriumHealth," accessed from atriumhealth.org, together as CMHA's "**Web Properties**." Compl. ¶¶ 3-4.

Plaintiffs allege that CMHA utilized tracking technology and in particular, the Meta Pixel, on its Web Properties. *Id.* ¶¶ 27, 158. The Meta Pixel, like other pixels offered by digital advertising platforms besides Meta, is a piece of code developed by Meta (formerly known as Facebook) that a website operator can incorporate to capture information about how users interact with a webpage while browsing. *Id.* ¶¶ 102, 107. This technology helps organizations like CMHA measure the efficacy of their digital marketing efforts. *Id.* ¶¶ 101, 105. The Meta Pixel allows website operators to record information from users' browsing so that they can understand more about how users are interacting with their website and determine if efforts to make the public aware of the availability of health care services have been successful. *Id.* ¶¶ 9, 19, 128.

According to Plaintiffs, depending on the Meta Pixel's configuration, information gathered by the tool can be transmitted to Facebook, a social-media platform operated by Meta, under certain circumstances. *Id.* ¶¶ 107, 118. Plaintiffs allege that when information is collected by the Meta Pixel, a unique ID is sent to Facebook along with the intercepted communications that allow Facebook to

identify the user and send that user digital advertising in a browser or social media platform. *Id.* ¶¶ 59, 85, 176.

Plaintiff Judith Roberts asserts she has been a patient of CMHA "since approximately 2006" and used CMHA's website "since at least September 2020." *Id.* ¶ 51. Plaintiff Judith Sigmon asserts she has been a patient of CMHA "since approximately 2007" and used CMHA's website "since on or about 2007." *Id.* ¶ 73.

Both Plaintiffs allege that they are Facebook users. *Id.* ¶¶ 57, 69, 80, 85. They assert that they browsed CMHA's website to search for information related to health conditions, doctors, and related subjects and to schedule appointments. *Id.* ¶¶ 55, 56, 77. Plaintiffs contend that when they visited CMHA's website the information they provided to CMHA was then conveyed to Facebook via the Meta Pixel, and that resulted in Plaintiffs "receiv[ing] spam and ads on Facebook and other social media related to medication and prescriptions." *Id.* ¶¶ 57, 78.

### B. The use of tracking technologies and HHS' issuance of the Original Bulletin and the Revised Bulletin

Pixels or similar computer code or applications that help website operators understand website users' interactions with websites are more broadly described as "tracking technologies." *Id.* ¶ 1. These technologies have been used on a widespread basis in modern-day advertising and commerce. *Id.* ¶ 101, 110. In the health care industry, for example, as of June 2022, 33 of the 100 largest hospital systems used tracking technologies on their consumer websites. *Id.* ¶¶ 125 & n.23. And, as of 2022, more than 664 hospital systems and providers used some form of tracking technology on their digital properties. *Id.* ¶ 125.

During the time that Plaintiffs allege that CMHA used the Meta Pixel, however, HHS, the agency charged with administering HIPAA, had not promulgated any regulatory pronouncement, rule, or other communication that evaluated how regulated entities might use tracking technologies. HHS first provided tracking technology guidance on December 1, 2022 when it promulgated its Original Bulletin. *See* Original Bulletin. In the Original Bulletin, HHS explained that tracking technologies have many benefits, including benefits that may help "improve care or the patient experience." *Id.* The Original Bulletin explained, *inter alia*, that depending on the kind of information tracking technology collects, the manner in which information is used, and the parties to which information is shared, some uses of tracking technology could be inconsistent with the requirements of the HIPAA Privacy Rule. *Id.*

On March 18, 2024, HHS issued the Revised Bulletin. *See* Compl. ¶ 134. The Revised Bulletin included more examples and explanations about how tracking technology could be used and should not be used in the health care environment. Revised Bulletin. Similar to the Original Bulletin, the Revised Bulletin did not ban tracking technologies. *Id.* Rather, the Revised Bulletin addressed questions about how regulated entities could use tracking technologies while still keeping within the purposes of the HIPAA Privacy Rule. *Id.*

On June 20, 2024, the U.S. District Court for the Northern District of Texas vacated substantial portions of the Revised Bulletin. *Am. Hosp. Ass'n*, 2024 WL 3075865, at *17. In that case, the American Hospital Association and health care

providers challenged the authority of HHS to issue the Original Bulletin and the Revised Bulletin. *Id.* at *3. On summary judgment, the district court held that the Revised Bulletin (which superseded the Original Bulletin) reflected new legal requirements that constituted an agency action that was subject to judicial review. *Id.* at *7. The court then reviewed the Revised Bulletin and held that HHS exceeded its authority in promulgating a rule that depended on the conclusion that the use of individuals' IP addresses through tracking technologies in connection with unauthenticated websites constituted the use of protected health information subject to HIPAA restrictions. *Id.* at *11.

### C. The nature of Plaintiffs' proposed class

Plaintiffs propose a nationwide class of individuals in the United States "whose Private Information was disclosed to a third party without authorization or consent through the Meta Pixel on Defendant's Web Properties." Compl. ¶ 268. They do not make any assertions about the proportion of class members who are North Carolina citizens. Both individual Plaintiffs appear to allege, however, that at the time they used CMHA's Web Properties they resided in North Carolina. *Id.* ¶¶ 45, 46. Although CMHA does not currently have analytics tracking where individuals are located when they are using its Web Properties generally, it does have a record of the addresses listed by individuals who have established MyAtriumHealth patient portal accounts.

As of April 10, 2024, the date that Plaintiffs filed this action, there were approximately 2,686,902 individuals who had established MyAtriumHealth patient portal accounts. Declaration of Mark Rhodes ¶ 9 (hereinafter "**Rhodes Decl.**"). Of

that number, 2,120,765 accountholders (approximately 79%), reported that their state of residence was North Carolina. Rhodes Decl. ¶ 9. The residencies of other accountholders are dispersed among the remaining 49 states and other jurisdictions. Rhodes Decl. ¶ 9. The next most represented state of residence among MyAtriumHealth patient portal accountholders is South Carolina, where approximately 270,000 accountholders say they reside. Rhodes Decl. ¶ 9.

The purpose of the Web Properties is to provide information and resources to individuals concerning health care facilities and health care providers that are a part of CMHA. Holloway Decl. ¶ 5. An overwhelming portion of the health care facilities and providers that are part of CMHA are located in North Carolina. Holloway Decl. ¶ 7. It is CMHA's experience that users of CMHA's Web Properties are directed to and use its Web Properties largely because they are located near CMHA facilities when they are using its Web Properties and usually also live near and around CMHA facilities. Holloway Decl. ¶ 8.

### D. The nature of Plaintiffs' claims

Plaintiffs have alleged seven claims. The first claim asserts that because Plaintiffs provided information to CMHA while using its Web Properties and CHMA disclosed that information to Facebook, CMHA should be liable for having "intercepted" a communication from Plaintiffs in violation of the ECPA. Compl. ¶¶ 281-321. Plaintiffs' other claims are based on North Carolina common law. Those claims include breach of contract, breach of the obligation of good faith and fair dealing, beach of implied contract, negligence, breach of fiduciary duty, and unjust enrichment. Each of the common-law claims expressly or impliedly rest on notions

that North Carolina law should be interpreted to incorporate substantive provisions of the Bulletins. In particular, they assert that, based on the Bulletins, information collected by tracking technologies constitutes protected health information subject to the restrictions of HIPAA. *See, e.g.*, *id.* ¶¶ 134, 136–41 (alleging technology use violates Bulletins). This legal contention is the basis for each of Plaintiffs' common-law claims. *See id.* ¶¶ 328, 348, 368, 389, 401, 407 (allegations concerning use of protected health information defined based on Bulletins).

## LEGAL STANDARD

For the portion of CMHA's Motion brought under Rule 12(b)(1), CMHA is "challeng[ing] the factual predicate of subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted). In such an instance, the trial court looks "beyond the allegations of the complaint" to determine "if there are facts to support the jurisdictional allegations without converting the motion to a summary judgment proceeding." *Id.* (citation omitted). In that analysis, "the presumption of truthfulness normally accorded a complaint's allegations does not apply, and the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction." *Id.* In determining whether the nature of the class meets CAFA's citizenship requirements, the Court may consider evidence offered via affidavit. *L. v. Priority Tr. Servs. of N.C., L.L.C.*, No. 3:08-CV-103, 2008 WL 3539512, at *3 (W.D.N.C. Aug. 11, 2008).

For the portion of CMHA's Motion bought under Rule 12(b)(6) asserting that Plaintiffs have failed to state a claim under the ECPA (Count One) and for unjust enrichment (Count Seven), the Plaintiffs' "'[f]actual allegations must be enough to

raise a right to relief above the speculative level,' thereby 'nudg[ing] their claims across the line from conceivable to plausible.'" *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 391 (4th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). While the Court "must accept the material facts alleged in the complaint as true, statements of bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009)); *see also Williams*, 2024 WL 898051, at *3 (citing similar standard for ECPA claims posed in class-action complaint against health care provider).

## <u>ARGUMENT</u>

### I. Federal jurisdiction is not supported by CAFA.

#### A. The Court should decline CAFA jurisdiction under the mandatory local controversy exception to CAFA.

Plaintiffs assert that this Court has jurisdiction pursuant to CAFA, 28 U.S.C. § 1332(d). Compl. ¶ 48. They allege that the amount in controversy exceeds $5,000,000 and that there are more than 100 class members. *Id.* Although those statements on their face are sufficient to establish diversity jurisdiction under CAFA, the Court must evaluate the nature of the class upon which CAFA jurisdiction depends. *Holden v. Carolina Payday Loans, Inc.*, No. 4:08-182-TLW-TER, 2008 WL 4198587, at *4 (D.S.C. Sept. 5, 2008) ("Mere allegations and bald assertions are insufficient to establish jurisdiction, especially when that jurisdiction is challenged."). If the factual record reveals that "two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed," that

circumstance presents the "mandatory local controversy exception" to CAFA. 28 U.S.C. § 1332(d)(4)(B).[4] If CAFA is the sole basis for federal jurisdiction and the mandatory local controversy exception is met, the case must be dismissed. *Id.*

Here, the Plaintiffs make no assertions concerning the proportion of class members who are citizens of North Carolina. In support of this Motion, CMHA has provided evidence that demonstrates that more than two-thirds of the members of the Plaintiffs' proposed class are likely citizens of North Carolina. The most specific evidence on this point is CMHA's evidence that members of the proposed class who have established MyAtriumHealth patient portal accounts overwhelmingly reside in North Carolina. Rhodes Decl. ¶ 9. That evidence indicates that approximately 79% of those class members reside in the state. Rhodes Decl. ¶ 9.

A party's residence is not the exclusive indicator of its citizenship. Rather, a person is a citizen of a state if she is a "domiciliary" of that state; whether a state is a person's "domicile" depends on whether a person is a resident of that state and intends "to remain in the state indefinitely." *Scott v. Cricket Comm'ns, LLC*, 865 F.3d 189, 195 (4th Cir. 2017). Given the challenge of demonstrating the intentions of numerous class individuals to determine citizenship, courts have held that they should take a practical and reasonable approach that does not require specific proof as to each class member and their intentions. *See Cook v. S.C. Pub. Serv. Auth.*, No. 6:19-CV-03285-TLW, 2020 WL 869741, at *8 (D.S.C. Jan. 21, 2020) (citing cases).

---

[4] CAFA presents two ways in which the mandatory local controversy exception may apply set forth in subsections (d)(4)(A) and (d)(4)(B). CMHA relies only on subsection (d)(4)(B) for this Motion.

In these contexts, courts have found that where a litigant demonstrates the residency of class members, courts may presume that those class members' state of residency equates to their domicile and, therefore, their citizenship. *See, e.g.*, *Goldberg v. Skyline Tower Painting Inc.*, No. 1:23-CV-01708-JRR, 2024 WL 1050942, at *10 (D. Md. Mar. 10, 2024); *see also Cook*, 2020 WL 869741 at *8. Thus, for example, in *Goldberg*, the district court held that it was more likely than not that two-thirds of a proposed class were citizens of Maryland for purposes of determining whether the mandatory local controversy exception to CAFA applied. 2024 WL 1050942, at *10. In reaching that conclusion, the district court relied on affidavit testimony that showed that 83.87% of class members listed their residence in the state of Maryland. *Id.* at *9-10.

The district court in *Cook* took a similar approach in deciding whether the "discretionary" local controversy exception to CAFA applied. 2020 WL 869741 at *8. That exception considers whether one-third of class members are citizens of the local state. 28 U.S.C. § 1332(d)(3). The district court concluded that the evidence showed that more than one-third of class members were South Carolina citizens based on a showing that class members' utility billing addresses were in South Carolina. *Cook*, 2020 WL 869741 at *8. Following the precedent of those decisions, this Court should conclude that more than two-thirds of the class members with MyAtriumHealth patient portal accounts are citizens of North Carolina.

Plaintiffs' proposed class, however, seeks to include *any* person who has used CMHA's Web Properties, not just those who have established patient portal

accounts. Compl. ¶ 268. The citizenship of that segment of Plaintiffs' proposed class is more difficult to determine because that segment includes any individual who used CMHA's Web Properties for any purpose. At the same time, the nature of the issues involved in this case are ones that would indicate that the state citizenship makeup of that segment of the class would not be substantially different than those who are MyAtriumHealth patient portal accountholders.

The purpose of CMHA's Web Properties is to provide information about the health care services that CMHA offers and the health care providers that deliver those services. And that information relates to CMHA's facilities and providers who are overwhelmingly located in the state of North Carolina. Not surprisingly, it is CMHA's experience that individuals who use its Web Properties, irrespective of whether they have a portal account, are located in and around CMHA's facilities. Holloway Decl. ¶ 8. Therefore, a substantial portion of them are likely to be North Carolina residents and therefore citizens. Consistent with this observation, both Plaintiffs' allegations appear to assert that they used the Web Properties while they were residents of North Carolina. *See* Compl. ¶¶ 45-46, 55, 77.

The likelihood that a substantial portion of the non-account class members who used CMHA's Web Properties are citizens of North Carolina is also consistent with the notion that the nature of health care is "local," i.e., persons seeking information about health care typically seek care available near where they live. *See* Holloway Decl. ¶ 8. It is also consistent with CMHA's experience that individuals land on CMHA's Web Properties because the internet search engines

they use provide CMHA's Web Properties in search results based on the close proximity of CMHA's facilities to the individual. Holloway Decl. ¶ 8.

Accordingly, the segment of the proposed class who are not MyAtriumHealth patient portal accountholders is likely to be comprised substantially of North Carolina residents as well. Even if the Court cannot be certain about the citizenship of this segment of class members, it can reasonably conclude that the citizenship of individuals in this segment is unlikely to alter the overall citizenship mix in a way that changes whether the mandatory local controversy exception to CAFA applies. For these reasons, the Court should conclude that it is more likely than not that two-thirds of Plaintiffs' proposed class is comprised of North Carolina citizens, the mandatory local controversy exception of 28 U.S.C. § 1332(d)(4) applies, and jurisdiction is not supported by CAFA.

### B. The Court should decline CAFA jurisdiction under the discretionary local controversy exception to CAFA.

Even if this Court could not conclude that the mandatory local controversy exception to CAFA applies, it should nevertheless apply the "discretionary" local controversy exception provided by 28 U.S.C. § 1332(d)(3). That provision authorizes the Court to decline CAFA jurisdiction where more than one-third but less than two-thirds of the members of the proposed class are citizens of the local state.

In deciding whether to apply the discretionary local controversy exception to CAFA, the Court considers six factors:

(1) whether the claims involve matters of national or interstate interest;

(2) whether the claims are governed by local state law;

(3) whether the action was brought in a forum with a nexus to class members, the alleged harm, or the defendants;

(4) whether the claims were pleaded to avoid federal jurisdiction;

(5) whether the number of local class members is substantially larger than any other state and the citizenship of other states is dispersed among the class; and

(6) whether in the three years prior, a proposed class action asserting similar claims was filed in the local forum.

*See* 28 U.S.C. § 1332(d)(3)(A))-(F).

Each of these factors is neutral to or favors declining CAFA jurisdiction. Assessing the first factor, nothing in this case appears to present matters of national or interstate interest. Assessing the second factor, except for Count One, a the claim under the ECPA, the claims are governed by North Carolina law. The third factor, whether there is a nexus between the parties and the forum, favors declining jurisdiction because there is a nexus between the North Carolina state court forum and the class members and the defendant. The fourth factor, whether claims were pleaded to avoid federal jurisdiction, does not apply.

The fifth factor, whether the number of class members of the local state is substantially larger than other states favors declining jurisdiction. North Carolina citizens may comprise upwards of 79% of the class. Rhodes Decl. ¶ 9; Holloway Decl. ¶ 8. The remaining class members are dispersed among numerous other jurisdictions, with no U.S. state representing more than 11% of the class. *See*

Rhodes Decl. ¶ 9. Finally, the sixth factor, whether a similar case has been filed in the local forum favors declining jurisdiction. On April 4, 2023, a plaintiff represented by different counsel filed an action in the North Carolina Superior Court, designated to North Carolina Business Court, that asserted almost identical claims arising from CMHA's alleged use of the Meta Pixel. *See generally* Complaint, *Rorie v. The Charlotte-Mecklenburg Hosp. Auth.*, Case No. 23-CVS-6166, ECF No. 3 (N.C. Super. Ct. Apr. 4, 2023), attached as **Exhibit 3**.

Thus, even if the Court decided that there were not sufficient facts to conclude that two-thirds of class members were North Carolina citizens, it is virtually certain that at least one-third of the members of the proposed class are North Carolina citizens and the discretionary local controversy exception may be applied. Thus, the factors set forth by the statute favor this Court declining CAFA jurisdiction here. *See Cook*, 2020 WL 869741, at *8 (remanding case to state court pursuant to section 1332(d)(3)).

## II. Plaintiffs' ECPA claim should be dismissed pursuant to Rule 12(b)(6).

As noted, Plaintiffs do not expressly invoke federal-question jurisdiction under 28 U.S.C. § 1331. *See* Compl. ¶ 48. But, because Plaintiffs in their ECPA claim have asserted a cause of action under federal law, Plaintiffs might base federal jurisdiction on the fact that they have raised a federal question. *See* 28 U.S.C. § 1331. Plaintiffs' ECPA claim, however, should be dismissed.

A claim under the ECPA requires a plaintiff to allege that the defendant, not another party, intercepted the plaintiff's private communications. More specifically, a plaintiff must plausibly assert that the defendant "(1) intentionally

(2) intercepted, endeavored to intercept or procured another person to intercept or endeavor to intercept (3) the contents of (4) an electronic communication, (5) using a device." *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 135 (3d Cir. 2015).

A crucial piece to whether a plaintiff has asserted a plausible claim is whether it was the defendant, not a third party, that "intercepted" so-called electronic communications from the plaintiff. *See id.* Where, for example, a plaintiff sends electronic communications to a defendant and then shares those communications with a third party, the plaintiff has not stated an ECPA claim because the defendant was a party to the communications and therefore did not "intercept" communications within the meaning of the statute. *See Expert Bus. Sys., LLC v. BI4CE, Inc.*, 233 F. App'x 251, 253 (4th Cir. 2007) (holding defendant did not violate ECPA where defendant forwarded confidential e-mails received from plaintiff to a third party without consent).

As applied to the context of internet technology, courts have concluded that the defendant's collection of information through embedded software, even without the plaintiff's knowledge, does not state a claim where the plaintiff transmitted such communications to the defendant. That was the holding of the Third Circuit in a case where plaintiffs alleged that Google was liable for collecting browsing history and other information from a "cookie" that Google installed on class members' computers. *In re Google*, 806 F.3d at 142-43. Plaintiffs in that case tried to assert that Google's installation of the cookie and subsequent compilation of data reflected

the interception of communications prohibited by the ECPA. *Id.* at 140. The court concluded that plaintiffs failed to state a claim, however, because the information derived from Google's cookie was the product of direct communication between Google and computer users. *Id.* at 142-43. Google, therefore, did not intercept communications, and plaintiffs' ECPA claim was dismissed. *Id.*

Applying that principle to this case means that Plaintiffs' ECPA claim fails for similar reasons. Plaintiffs allege in their Complaint that the Meta Pixel and other tracking technologies operate like the cookie in *In re Google*. They assert that CMHA "install[ed], configure[ed] and us[ed] pixels and other technologies on its Website," Compl. ¶ 4; *see also id.* ¶¶ 393, 395, and as users interacted with CMHA's website, CMHA obtained that information and shared it with Meta. They allege, for example, that searching CMHA's website using keywords (Compl. ¶¶ 18, 19) or attempting to make appointments with providers through CMHA's website (Compl. ¶ 30) allowed CMHA to collect information that CMHA then "shared," "disclosed," or "transmitted" to Meta. *Id.* ¶¶ 16-18, 28, 31, 34. These allegations, like the circumstances in *Google*, describe users' communications with CMHA while they browsed CMHA's Web Properties. Even though Plaintiffs assert they were harmed by CMHA's supposed "disclosure" or "transmission" to Meta, CMHA was a party to the communications, and therefore Plaintiffs have failed to state a claim.

In many instances, Plaintiffs' Complaint labels CMHA's collection of information through the Meta Pixel as the "interception" of information. *E.g.*, *id.* ¶¶ 32, 33, 34, 37. But such a label does not change the fact that the information

that Plaintiffs allege was collected while they browsed CMHA's Web Properties was derived from communications between Plaintiffs and CMHA. *Cf. In re Google*, 806 F.3d at 142 (rejecting conclusory allegations contradicting factual allegations that cookie-sourced information constituted communications with defendant). If there were any doubt that the information at issue was the product of direct communications between users and CMHA, that doubt is resolved by Plaintiffs' allegation in paragraph 37 that Plaintiffs believed when they provided information to CMHA "they were communicating with only their trusted healthcare providers." Compl. ¶ 37.

The U.S. District Court for the Middle District of North Carolina dismissed nearly identical ECPA claims in two separate Meta Pixel class-action complaints for the same reasons. In *Allen*, the court dismissed the plaintiffs' ECPA claim because the complaint similarly asserted that the defendant health care provider "received" information by virtue of pixel use. 2023 WL 5486240, at *4. The ECPA claim should be dismissed, the court concluded, because the information was "sent to [defendants] directly and specifically by the plaintiffs, and that it was Facebook that intercepted the communication via the pixel," not the defendant health care provider. *Id.* Likewise, in *Williams*, the court dismissed the plaintiff's ECPA claim because the "mere receipt of a communication [by defendant health care provider] does not constitute a violation" under the ECPA. 2024 WL 898051, at *8. This Court should follow the decisions by that court and dismiss Plaintiffs' ECPA claim.

## III. The Court should decline to exercise supplemental jurisdiction over the remaining state-law claims.

Without a federal claim to support federal-question jurisdiction, the Court should decline to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367. When a district court dismisses the only claim that provided the basis for federal-question jurisdiction, it has discretion to decline jurisdiction over the remaining state-law claims. 28 U.S.C. § 1367(c); *see Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 617 (4th Cir. 2001); *Shanaghan v. Cahill*, 58 F.3d 106, 109 (4th Cir. 1995). The court may decline to exercise supplemental jurisdiction if:

> (1) the claim raises a novel or complex issue of state law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C.A. § 1367(c). In deciding whether to decline supplemental jurisdiction, the Court should also consider "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Henderson v. Harmon*, 102 F.4th 242, 251 (4th Cir. 2024) (quoting *Shanaghan*, 58 F.3d at 109). Each of these factors favors declining supplemental jurisdiction here.

First, Plaintiffs' state-law claims raise novel theories of state tort and contract law with no underlying issue of federal policy. *See* 28 U.S.C. § 1367(c)(1). As detailed above, Plaintiffs' state law claims require the Court to conclude that

HHS' Bulletins dictate that certain metadata definitively constitutes protected health information. Based on their reading of those Bulletins—which have been partially vacated by another federal court—Plaintiffs assert that common-law North Carolina tort law should incorporate the same HHS Bulletins' definitions. Moreover, Plaintiffs contend that the definitions in HHS' Bulletins should apply retrospectively to conduct that occurred prior to the agency providing guidance on these issues. These are novel and unprecedented positions on matters of state law. Accordingly, this Court may exercise its discretion to allow state courts to decide these issues in the first instance. *See, e.g.*, *Arrington v. City of Raleigh*, 369 F. App'x 420, 423 n.2 & 424 (4th Cir. 2010) (remanding case based on novel and complex issue and noting that "[a] decision or ruling in this case could well bring waves of consequences to other North Carolina . . . entities").

Second, Plaintiffs' state-law claims predominate over all other claims. Only Plaintiffs' ECPA claim arises under federal law, and that claim should be dismissed. Notwithstanding Plaintiffs' effort to connect their state claims to federal agency guidance, each of their other claims arise under state law.

Finally, this case raises matters of local concern. First, Plaintiffs' claims center on the provision of health care by a North Carolina hospital authority by and large to North Carolina citizens. Second, Plaintiffs' claims pose the issue of whether a court should, in effect, create a civil, common-law remedy for what amounts to the use of widespread and commonplace technological internet marketing tools, even as North Carolina's legislature has thus far declined to do so. In these ways at least,

Plaintiffs' claims present a "matter of particularly local concern," and this Court should use its discretion to decline supplemental jurisdiction. *See Simpson v. StoneMor GP, LLC*, No. 3:23-CV-00217-KDB-SCR, 2024 WL 1340561, at *10 (W.D.N.C. Mar. 28, 2024); *see also Carolina Destinations, LLC v. Iredell Cnty.*, No. 5:24-CV-00003-KDB-DCK, 2024 WL 775170, at *4 (W.D.N.C. Feb. 26, 2024) (declining to exercise supplemental jurisdiction and noting that "[d]istrict courts may abstain from adjudicating local zoning disputes when state courts should hear the case initially due to their familiarity and experience with such matters" (internal quotation marks omitted)); *Smith v. Pollino*, No. 3:19-CV-00639-KDB-DCK, 2020 WL 2104947, at *1 (W.D.N.C. May 1, 2020) (dismissing the lone federal claim in an "intensely local political dispute").

## IV. Even if the Court retains jurisdiction over the Plaintiffs' unjust-enrichment claim, it should be dismissed.

If the Court denies CMHA's Motion to dismiss this case on jurisdictional grounds, it should dismiss Plaintiffs' unjust-enrichment claim. For Plaintiffs to state a claim for unjust enrichment, they must plausibly assert that Plaintiffs and CMHA had an expectation that Plaintiffs would be compensated for the benefit supposedly conferred, namely, the use of information users provided to CMHA while using CMHA's Web Properties. *See Regency Ctrs. Acquisition, LLC v. Crescent Acquisitions, LLC*, No. 17 CVS 11354, 2018 WL 562749, at *10 (N.C. Super. Ct. Jan. 24, 2018) (to plead unjust enrichment, a plaintiff must show that "both parties understood that services were rendered with the expectation of payment"); *Weddle v. WakeMed Health and Hosps.*, No. 22 CVS 13860, 2023 WL 8369786, at *5-6 (N.C.

Super. Ct. Dec. 4, 2023) (same). Here, Plaintiffs make no allegations that reflect an expectation by Plaintiffs or CMHA that Plaintiffs would be compensated for information collected by tracking technologies used on CMHA's Web Properties. *See* Compl. ¶ 200. To the contrary, Plaintiffs' allegations assert that Plaintiffs provided the information at issue not in exchange for compensation of some kind but "[a]s a condition of receiving [CMHA's medical] services." *Id.* ¶¶ 52, 74.

On similar facts, the North Carolina Business Court held that a plaintiff failed to state a claim. *Weddle*, 2023 WL 8369786, at *6. In that case, plaintiffs asserted that health care provider WakeMed was unjustly enriched because it used information gathered through the Meta Pixel without plaintiffs' consent. *Id.* Plaintiffs in that case, however, asserted that they provided the pixel-developed information to the defendant "in exchange for medical services." *Id.* Because that allegation meant that plaintiffs had no expectation of compensation for the use of that information, the court held that plaintiffs failed to state an unjust-enrichment claim. *Id.* This Court should follow the decision in *Weddle* and dismiss Plaintiffs' unjust-enrichment claim. *See also Allen,* 2023 WL 5486240, at *3 (dismissing unjust-enrichment claim against health care provider based on use of Meta Pixel).

## **CONCLUSION**

For the reasons set forth above, the Court should dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1). If the Court does not dismiss the Complaint on jurisdictional grounds, it should dismiss the ECPA claim and the state law unjust-enrichment claim with prejudice, and enter such other and further relief as the Court deems proper.

This the 22nd day of July, 2024.

**ROBINSON, BRADSHAW & HINSON, P.A.**

/s/ Jonathan C. Krisko

Jonathan C. Krisko
N.C. State Bar No. 28625
Jordan T. DeJaco
N.C. State Bar No. 57866
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
Telephone: (704) 377-2536
jkrisko@robinsonbradshaw.com
jdejaco@robinsonbradshaw.com

Preetha Suresh Rini
N.C. State Bar No. 51022
434 Fayetteville Street, Suite 1600
Raleigh, North Carolina 27601
Telephone: (919) 239-2600
prini@robinsonbradshaw.com

*Attorneys for Defendant The Charlotte-Mecklenburg Hospital Authority*

## ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Court's June 18, 2024 Order, 3:24-mc-104, I hereby certify that:

- No artificial intelligence was employed in doing the legal research for the preparation of this document, with the exception of such artificial intelligence embedded in standard on-line legal research sources such as Westlaw, Lexis, FastCase, and Bloomberg; and

- Every statement and every citation to an authority contained in this document has been checked by an attorney at this firm and/or paralegal working at their direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 22nd day of July, 2024.

/s/ Jonathan C. Krisko
Jonathan C. Krisko