## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JULIE ROBERTS AND JUDITH SIGMON, *individually and on behalf of all others similarly situated*, | Case No.: 3:24-cv-00382-KDB-SCR |
| Plaintiffs, | **DEMAND FOR JURY TRIAL** |
| vs. | |
| THE CHARLOTTE-MECKLENBURG HOSPITAL AUTHORITY (d/b/a ATRIUM HEALTH), | |
| Defendant. | |

## THIRD AMENDED CLASS ACTION COMPLAINT

Plaintiffs Julie Roberts and Judith Sigmon ("**Plaintiffs**"), individually and on behalf of all others similarly situated, bring this class action lawsuit against Defendant The Charlotte-Mecklenburg Hospital Authority (d/b/a Atrium Health) ("**Atrium**" or "**Defendant**"). Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts and upon information and good faith belief as to all other matters based on investigation conducted by undersigned counsel.

## INTRODUCTION

1.      This case seeks legal redress for Defendant's decision to dominate the regional healthcare markets by installing tracking technologies on its website to collect its patients' personal health information and—without consent—to deliberately disclose that highly sensitive information to third-party platforms like Facebook and Google for marketing purposes.

2.     Defendant Atrium is a healthcare organization and hospital network offering a wide range of clinical services to patients across multiple states.[1] Defendant operates 40 hospitals, 7 emergency departments, 30 urgent care centers and approximately 1400 additional care locations throughout North Carolina, South Carolina, Georgia and Alabama. According to Atrium, it has approximately 34,000 patient encounters every day across these locations.[2]

3.     In order to market, sell and provide its healthcare offerings, Defendant owns, maintains and operates a website available at https://atriumhealth.org/ (the "**Website**"), and a patient portal available at https://my.atriumhealth.org/myatriumhealth (the "**Portal**" and collectively with the Website, the "**Web Properties**").

4.     Defendant disregarded the privacy rights of its patients who used its Web Properties ("**Users**" or "**Class Members**") by installing, configuring and using pixels and other tracking technologies on its Website (and upon information and good faith belief, its Portal) to collect and divulge their personally identifiable information ("**PII**") and protected health information ("**PHI**" collectively, "**Private Information**") to Meta Platform Inc. d/b/a Facebook ("**Meta**" or "**Facebook**"), Alphabet, Inc. d/b/a Google ("**Google**") and other social media platforms.

5.     Atrium encouraged and required Plaintiffs and Class Members to use its Web Properties, including the Portal, to receive healthcare services.

6.     In doing so, Atrium encouraged and required patients to communicate their Private Information via its Web Properties, such as their physician's name and search parameters, medical conditions and treatments. Patients provided this information to obtain and manage their

---

[1]     *Atrium        Health        2019        Annual        Report,* https://atriumhealth.org/files/build_annual_report/index.html

[2] *Id.*

appointments, access medical forms, view medical records and test results, pay medical bills and more.

7. At all times, Plaintiffs and Class Members had a reasonable expectation that the Private Information they communicated via the Web Properties in conjunction with their medical care would remain private, secure and would only be used for their medical treatment.

8. Further, Atrium made express and implied promises to protect Plaintiffs' and Class Members' Private Information and to maintain the privacy and confidentiality of its patients' communications. It broke this promise.

9. Unbeknownst to Users and without their authorization or informed consent, Defendant installed Facebook's Meta Pixel ("**Meta Pixel**" or "**Pixel**"), Google Analytics and other invisible third-party tracking technology on its Website in order to intercept Users' PII and PHI with the express purpose of disclosing that Private Information to third parties such as Meta and Google in violation of HIPAA as well as state, federal and common law.[3]

10. The Private Information of potentially millions of active or potential Atrium patients was improperly and unlawfully disclosed without their knowledge or consent. Atrium knows that this sensitive information has tremendous value and that Plaintiffs and Class Members would ***not*** consent to its use in marketing or its dissemination to Meta and Google if they were provided a choice or would demand significant compensation.

---

[3] The Facebook tracking and data collection tools include the Meta Pixel, Meta SDK, Meta Conversions API, customer list uploads, social plug-ins, the Meta Graph API, server-to-server transmissions and similar collection tools (collectively, "**Meta Collection Tools**"). The Google tracking and collection tools include Google Analytics, Google Tag Manager, DoubleClick, social plug-ins, server-to-server transmissions and similar collection tools (collectively, "**Google Collection Tools**").

11.     The information Google and Meta received via the Website identified specific patients, thereby revealing their medical symptoms, medical conditions, the specific type of care they received from Atrium and any other PHI they communicated via the Website.[4]

12.     Among the PII that Defendant discloses is a User's unique and persistent Facebook ID which allows Facebook and other third parties to personally identify that User and associate the Users' Private Information with its Facebook profile. The Facebook ID is a string of numbers Facebook uses to identify and connect to a User's Facebook profile. Facebook creates a Facebook ID automatically, whether or not a User chooses to create a username.[5] Thus Facebook, which creates and maintains the Facebook ID directly connected to a User's Facebook account, utilizes the Facebook ID to personally identify each User whose Private Information is disclosed to it.

13.     Transmitting Private Information allows a third party (*e.g.*, Google and Meta/Facebook) to know that a specific patient was seeking confidential medical care. This type of disclosure could also allow a third party to know or reasonably infer that a specific patient was being treated for a specific type of medical condition such as cancer, pregnancy or AIDS.

14.     Google collects the transmitted identifiable health information and uses cookies, IP addresses and other unique identifiers to match it to Google users, allowing Atrium to target advertisements on and off Google. Similarly, Meta collects the transmitted identifiable health

---

[4] Specific individuals can be identified by their IP address information, device identifiers, advertising identifiers that Meta associates with a patient's Facebook account and identifiers that Google associates with a patient's identity—including a unique cookie ID and their IP address. Additionally this may also include a patient's demographic information, email address, phone number, computer ID address or contact information entered as emergency contacts or for advanced care planning, along with information like appointment type and date, a selected physician, button and menu selections, the content of buttons clicked and typed into text boxes, and information about the substance, purport, and meaning of patient requests for information from Atrium under federal and state health privacy laws.

[5] *See* https://www.facebook.com/help/211813265517027.

4

information and uses cookies to match it to Facebook users allowing Atrium to target advertisements on and off Facebook. Atrium, Google and Meta can target ads to a person who has used the Website and exchanged communications about a specific condition.

15.     The Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**"), Pub. L. No. 104-191, 110 Stat. 1936 (1996) prohibits healthcare providers from sharing health care information, medical records and related information with third parties except as needed for a patient's treatment, payment or with their consent.

16.     HIPAA gives patients a reasonable expectation of privacy in communications with healthcare providers relating to their medical conditions and treatment, because this information may not be disclosed outside the healthcare setting without notice and consent.

17.     The Office for Civil Rights ("**OCR**") at the United States Department of Health and Human Services ("**HHS**") affirmed that HIPAA and its regulations prohibit the transmission of individually identifiable health information ("**IIHI**") by tracking technology like the Google and Meta Collection Tools without the patient's authorization and other protections like a business associate agreement with the recipient of patient data.[6]

---

[6] *See* Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (noting that "IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services."). This guidance was recently vacated *in part* by a federal district court in the Northern District of Texas due to the court finding it in part to be the product of improper rulemaking, and it is cited for reference only until OCR updates its guidance, should it do so in the future. *See American Hosp. Ass'n. v. Becerra*, 2024 WL 3075865 (S.D. Tex., Jun. 20, 2024). The Court's Order found only that OCR's guidance regarding covered entities' collection and disclosure to third parties of users' IP addresses while they navigated *unauthenticated public webpages* ("**UPWs**") was improper rulemaking. The Order in no way affects or undermines OCR's guidance regarding covered entities disclosing unique personal identifiers, such as Google or Facebook identifiers, to third parties while patients make appointments for particular conditions, pay medical bills or log into (or use) a patient portal. *See*

18.     Reiterating the importance of and necessity for data security and privacy concerning health information, the FTC published a bulletin entitled *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases*, in which it noted that:

> [h]ealth information is not just about medications, procedures, and diagnoses. ***Rather, it is anything that conveys information—or enables an inference—about a consumer's health***. Indeed, [recent FTC enforcement actions involving] *Premom*, *BetterHelp*, *GoodRx* and *Flo Health* **make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information.**[7]

19.     The FTC is unequivocal in its stance as it informs healthcare companies that they should ***not*** use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> **Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.**
> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. ***But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.***
> [Recent FTC enforcement actions such as] *BetterHelp*, *GoodRx*, *Premom*, and *Flo* make clear that

---

*id.* at 3-4, 31, n. 8 (vacating OCR guidance with respect to the "Proscribed Combination" defined as "circumstances where an online technology connects (1) an individual's IP address with (2) a visit to a UPW addressing specific health conditions or healthcare providers" but stating that "[s]uch vacatur is not intended to, and should not be construed as, limiting the legal operability of other guidance in the germane HHS document."). Furthermore, the Federal Trade Commission's ("**FTC**") bulletin on the same topics remains untouched as do its enforcement actions against numerous healthcare providers for using similar (if not identical) collection tools as Atrium.

[7] *See* Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases,* the FTC Business Blog (July 25, 2023) (emphasis added), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases.

practices like that ***may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information***.[8]

20.     Not only did Atrium willfully and intentionally incorporate the Google and Meta Collection Tools into its Website, but it also never disclosed to Plaintiffs or Class Members that it shared their sensitive and confidential communications via the Website with Google or Facebook.

21.     As a result, Plaintiffs and Class Members were unaware that their PII and PHI was surreptitiously transmitted to Facebook and Google as they communicated with their healthcare providers, looked up their conditions or treatments and clicked to access the login page for the MyChart portal.[9]

22.     Plaintiffs and Class Members who visited and used Defendant's Web Properties thought they were communicating with <u>only</u> their trusted healthcare providers and reasonably believed that their sensitive and private PHI would be guarded with the utmost care. In browsing Defendant's Website—to make an appointment, locate a doctor with a specific specialty, find sensitive information about their diagnosis or investigate treatment for their diagnosis—Plaintiffs

---

[8] *Id.* (emphasis added) (further noting that *GoodRx & Premom* underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC and, in some cases, the media, of disclosures of health information without consumers' authorization.

[9] In contrast to Defendant, several healthcare providers which have installed the Meta Pixel on their Web Properties have provided their patients with notices of data breaches caused by the Pixel transmitting PHI to third parties. *See, e.g.*, *Cerebral, Inc. Notice of HIPAA Privacy Breach*, https://cerebral.com/static/hippa_privacy_breach-4000c6eb21449c2ecd8bd13706750cc2.pdf; Annie Burky, *Advocate Aurora says 3M patients' health data possibly exposed through tracking technologies,* Fierce Healthcare (October 20, 2022), https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3; *Novant Health Notifies 1.3M Patients of Unauthorized PHI Disclosure Caused By Meta Pixel* (August 17, 2022), https://healthitsecurity.com/news/novant-health-notifies-patients-of-unauthorized-phi-disclosure-caused-by-meta-pixel#:~:text=August%2017%2C%202022%20%2D%20North%20Carolina,protected%20health%20information%20(PHI).

7

and Class Members did not expect that every search (including exact words and phrases they typed into Defendant's Website search bars), health conditions (e.g., breast cancer or pregnancy), diagnoses (e.g., stroke, arthritis or AIDS), procedures or appointments sought, treatment status, intent to pay medical bills or access medical records, the name of their treating physician or their intent to access Defendant's Portal would be intercepted, captured and otherwise shared with Facebook or Google to target them with ads, in conscious disregard of their privacy rights.

23.     Defendant knew that embedding the Meta Pixel on its Website permitted Facebook to collect and use Plaintiffs' and Class Members' Private Information.

24.     Defendant (or any third parties) did not obtain Plaintiffs' and Class Members' prior consent before sharing their sensitive, confidential communications with third parties.

25.     Defendant's actions constitute an extreme invasion of Plaintiffs' and Class Members' right to privacy and violate federal and state statutory and common law as well as Defendant's own Privacy Policies that affirmatively state that any personal information provided to Defendant will remain secure and protected.[10]

26.     As a result of Defendant's conduct, Plaintiffs and Class Members have suffered numerous injuries, including (i) invasion of privacy; (ii) lack of trust in communicating with doctors online; (iii) emotional distress and heightened concerns related to the release of Private Information to third parties;  (iv) loss of the benefit of the bargain; (v) diminution in the value of their Private Information and (vi) continued and ongoing risk to their Private Information.

27.     Plaintiffs and Class Members have a substantial risk of future harm due to the continued and ongoing risk of misuse of their Private Information that was shared by Defendant

---

[10] Atrium's Privacy Policies (and other affirmative representations) represent to Users that it will not share Private Information with third parties without the patient's consent. *See* https://atriumhealth.org/for-patients-visitors/privacy.

with unauthorized third parties.

28.     Plaintiffs seek, on behalf of themselves and a class of similarly situated persons, to remedy these harms and therefore assert the following statutory and common law claims against Defendant: (i) Violation of the Electronic Communications Privacy Act, 18 U.S.C. §2511(1), *et seq* ("**ECPA**"); (ii) Negligence; (iii) Breach of Express Contract, (iv) Breach of Implied Duty of Good Faith and Fair Dealing, (v) Breach of Implied Contract, (vi) Breach of Fiduciary Duty and (vii) Unjust Enrichment.

## PARTIES

29.     Plaintiff Julie Roberts is a Michigan citizen, residing in Oakland County, Michigan, where she intends to remain indefinitely.

30.     Plaintiff Roberts was a patient of Atrium between September 2007 and 2011 as well as between September 2020 and October 2023 and has been using its Web Properties since at least September 2020.

31.     Plaintiff Roberts was a resident of Watauga County, North Carolina during the relevant times until she moved to Michigan in or about October 2023.

32.     Plaintiff Judith Sigmon is and at all relevant times was a North Carolina resident, residing in Forsyth County, North Carolina.

33.     Plaintiff Sigmon has been a patient of Atrium since 2007 and has used its Web Properties since Atrium introduced its Portal.

34.     Defendant The Charlotte-Mecklenburg Hospital Authority (d/b/a Atrium Health) is a healthcare service provider. Defendant is incorporated in North Carolina with its principal place of business located at 1000 Blythe Boulevard in Charlotte, North Carolina 28203.

9

## JURISDICTION & VENUE

35. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under federal law, including the ECPA, 28 U.S.C. § 2511, *et seq.* The Court has supplemental jurisdiction over Plaintiffs' claims arising under state law under 28 U.S.C. § 1367.

36. This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C § 1332(d) because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than one hundred putative class members defined below and minimal diversity exists because Plaintiff Julie Roberts and a significant portion of putative class members are citizens of a state different from the citizenship of at least one Defendant.

37. Pursuant to 28 U.S.C. Section 1391, this Court is the proper venue because a substantial part of the events, omissions and acts giving rise to the claims herein occurred in this District. At least one Plaintiff resides in and used Defendant's Web Properties within this District. Defendant received substantial compensation from offering healthcare services in this District and Defendant made numerous misrepresentations which had a substantial effect in this District.

38. Defendant is subject to personal jurisdiction in North Carolina because Defendant maintains its principal place of business in North Carolina and is authorized to conduct and is conducting business in North Carolina.

## REPRESENTATIVE PLAINTIFFS' EXPERIENCES

### A. *Plaintiff Julie Roberts*

39. Plaintiff Roberts has been a patient of Defendant since approximately 2006 and has utilized Defendant's Web Properties since at least September 2020.

40. As a condition of receiving Defendant's services, Plaintiff Roberts disclosed her Private Information to Defendant on numerous occasions and most recently in October 2023.

10

41.     Plaintiff Roberts accessed Defendant's Web Properties on her phone and computer to receive healthcare services from Defendant and at Defendant's direction.

42.     Plaintiff Roberts has used and continues to use the same devices to maintain and access an active Facebook account throughout the relevant period in this case.

43.     During the relevant time period (when Defendant's Pixels were present) Plaintiff Roberts used Defendant's Website to research ██████████████████████████████; research doctors, schedule appointments, understand test results, ████████████ and look for Defendant's locations close to her address including ████████████████████████ ██████████████████████.

44.     In 2020, Plaintiff Roberts was diagnosed with ██████████████████████ ██████████ and submitted information to Defendant's Web Properties about her condition and treatments received, as well as scheduled appointments to receive those treatments.

45.     Shortly after submitting her PHI including information concerning their specific symptoms and treatments to Defendant, Plaintiff Roberts began to receive spam and ads on Facebook and other social media related to medications and prescriptions.

46.     Plaintiff Roberts began receiving these ads after her PII and PHI concerning her medical condition was disclosed by Defendant through the Pixel to Meta, such as ████████████ ██████████████████████████████.

47.     Meta viewed and accessed this Private Information so that it could personally identify Plaintiff Roberts by connecting the c_user FID to her Facebook account. Meta also accesses the PHI disclosed by Defendant so that it can use the specific medical information Plaintiff Roberts shared with Defendant to identify specific targeted ads related to Plaintiff Roberts' medical condition to send to her Facebook account. After accessing and identifying the

11

specific medical conditions it can target with ads, Meta then shares that information with other unauthorized third parties whose businesses and advertisements are related to those conditions.

48.     The full scope of Defendant's interceptions and disclosures of Plaintiff Roberts' communications to Meta can only be determined through formal discovery. However, Defendant intercepted at least the following communications about Plaintiff Roberts' patient status, medical ██████████, treatments sought and prospective specialized healthcare providers, via the following long-URLs or substantially similar URLs that were sent to Meta via the Pixel (and which contain information concerning Plaintiff Roberts' specific medical conditions, queries, as well as types of providers and treatments sought):



49.     Contemporaneously with the interception and transmission of the contents of Plaintiff Roberts' communications regarding her conditions on the Website, Defendant also disclosed to Meta Plaintiff Roberts' unique personal identifiers including but not limited to, her Facebook ID and IP address.

50.     During the relevant time period, when Defendant's Pixels were present, Plaintiff Roberts also utilized Defendant's Patient Portal to review her medical records such as her visit summaries, doctor's notes and test results.

12

51.     The full scope of Defendant's interceptions and disclosures of Plaintiff Roberts' communications to Meta can only be determined through formal discovery.

52.     However, upon information and good faith belief, Defendant intercepted at least the following communications about Plaintiff Roberts' patient status, via the following URLs or substantially similar URLs were sent to Meta via the Pixel, indicating that Plaintiff Roberts is a patient of Defendant who is about to use the patient portal:

- https://my.atriumhealth.org/myatriumhealth/authentication/login

53.     Plaintiff Roberts reasonably expected that her communications with Defendant via the Web Properties were confidential, solely between herself and Defendant and that such communications would not be transmitted to or intercepted by a third party.

54.     Plaintiff Roberts provided her Private Information to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law.

55.     As described herein, Defendant worked along with Facebook to intercept Plaintiff Roberts' communications, including those that contained her Private Information.

56.     Defendant willfully facilitated these interceptions without Plaintiff Roberts' knowledge, consent or express written authorization.

57.     Defendant transmitted to Facebook Plaintiff's Facebook ID, computer IP address and sensitive health information such as her medical symptoms, conditions, treatments sought, physician selected, button/menu selections and content typed into free text boxes.

58.     By doing so without her consent, Defendant breached Plaintiff Roberts' privacy and unlawfully disclosed her Private Information.

59.     Defendant did not inform Plaintiff Roberts that it had shared her Private Information with Facebook.

60.     Plaintiff Roberts would not have utilized Defendant's medical services, used its Web Properties or would have paid much less for Defendant's services had she known that her Private Information would be captured and disclosed to third parties like Facebook without her consent.

**B.     *Plaintiff Judith Sigmon***

61.     Plaintiff Sigmon has been a patient of Defendant since approximately 2007 and has utilized Defendant's Web Properties since on or about 2007.

62.     As a condition of receiving Defendant's services, Plaintiff Sigmon disclosed her Private Information to Defendant on numerous occasions, most recently in 2024.

63.     Plaintiff Sigmon accessed Defendant's Web Properties on her phone and computer to receive healthcare services from Defendant and at Defendant's direction.

64.     Plaintiff Sigmon has used and continues to use the same devices to maintain and access an active Facebook account throughout the relevant period in this case.

65.     During the relevant time period (when Defendant's Pixels were present) Plaintiff Sigmon used the search bar embedded on Defendant's Website to research ███████████. Additionally, Plaintiff Sigmon used the Website to locate ██████. Further, she used the Web Properties to research doctors, schedule appointments, understand test results, upload insurance information, ████████ and look for Defendant's locations close to her address including ████████████.

66.     Shortly after submitting her PHI including information concerning her specific symptoms and treatments to Defendant, Plaintiff Sigmon began to receive spam and ads on Facebook and other social media related to her specific health conditions.

14

67.     Upon information and good faith belief, Plaintiff Sigmon began receiving these ads after her PII and PHI concerning her medical conditions were disclosed by Defendant through the Pixel to Meta.

68.     Meta viewed and accessed this Private Information so that it could personally identify Plaintiff Sigmon by connecting the c_user FID to their Facebook account.

69.     Meta also accesses the PHI disclosed by Defendant so that it can use the specific medical information Plaintiff Sigmon shared with Defendant to identify specific targeted ads related to Plaintiff Sigmon's medical condition to send to their Facebook account.

70.     After accessing and identifying the specific medical conditions it can target with ads, Meta then shares that information with other unauthorized third parties whose businesses and advertisements are related to those conditions.

71.     The full scope of Defendant's interceptions and disclosures of Plaintiff Sigmon's communications to Meta can only be determined through formal discovery.

72.     However, Defendant intercepted at least the following communications about Plaintiff Sigmon's patient status, ██████████████, treatments sought and prospective specialized healthcare providers, via the following long-URLs or substantially similar URLs that were sent to Meta via the Pixel (and which contain information concerning Plaintiff Sigmon's specific medical conditions, queries, as well as types of providers and treatments sought):

- ████████████████████████████████
- ██████████████████
  ██████████████████████
- ██████████████████
  ████████████████████

- ███████████████████████████

  ████████████████████████████████

- ████████████████████████████████████████

- ████████████████████████████████████

- ██████████████████████

73. Contemporaneously with the interception and transmission of the contents of Plaintiff Sigmon's communications regarding her condition on https://www.atriumhealth.org/, Defendant also disclosed to Meta Plaintiff Sigmon's unique personal identifiers, including but not limited to, her Facebook ID and IP address.

74. During the relevant time period, when Defendant's Pixels were present, Plaintiff Sigmon also utilized Defendant's Patient Portal to review her medical records such as her visit summaries, doctor's notes and her test results.

75. Upon information and good faith belief, Defendant intercepted at least the following communications about Plaintiff Sigmon's patient status, via the following URLs or substantially similar URLs were sent to Meta via the Pixel, indicating that Plaintiff Sigmon is a patient of Defendant who is about to use the patient portal:

- https://my.atriumhealth.org/myatriumhealth/authentication/login

76. Plaintiff Sigmon reasonably expected that her communications with Defendant via the Web Properties were confidential, solely between herself and Defendant and that such communications would not be transmitted to or intercepted by a third party.

77. Plaintiff Sigmon provided her Private Information to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law.

16

78. As described herein, Defendant worked along with Facebook to intercept Plaintiff Sigmon's communications, including those that contained their Private Information.

79. Defendant willfully facilitated these interceptions without Plaintiff Sigmon's knowledge, consent or express written authorization.

80. Defendant transmitted to Facebook Plaintiff Sigmon's Facebook ID, computer IP address and sensitive health information such as her medical symptoms, conditions, treatments sought, physician selected, button/menu selections and content typed into free text boxes.

81. By doing so without her consent, Defendant breached Plaintiff Sigmon's privacy and unlawfully disclosed their Private Information.

82. Defendant did not inform Plaintiff Sigmon that it had shared her Private Information with Facebook.

## FACTUAL BACKGROUND

### A. *The Use of Invisible Tracking Codes by Healthcare Providers to Send Meta People's Data for its Advertising Business.*

83. Meta operates the world's largest social media company whose revenue is derived almost entirely from selling targeted advertising.

84. The Meta Pixel and other third-party tracking tools also collect and transmit information from Defendant that identifies a Facebook user's status as a patient and other health information that is protected by federal and state law. This occurs through tools that Facebook encourages its healthcare Partners to use, including to upload patient lists to Facebook for use in its advertising systems.

85. Meta associates the information it obtains via the Meta Pixel with other information regarding the User, using personal identifiers that are transmitted concurrently with other information the Pixel is configured to collect.

17

86.     For Facebook account holders, these identifiers include the "c_user" cookie IDs, which allow Meta to link data to a particular Facebook account. For both Facebook account holders and users who do not have a Facebook account, these identifiers also include cookies that Meta ties to their browser.

87.     Realizing the value of having direct access to millions of consumers, in 2007, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming it to be a "completely new way of advertising online" that would allow "advertisers to deliver more tailored and relevant ads."[11]

88.     One of its most powerful advertising tools is Meta Pixel, formerly known as Facebook Pixel, which launched in 2015.

89.     Ad targeting has been extremely successful due, in large part, to Facebook's ability to target people at a granular level. "Among many possible target audiences, Facebook offers advertisers, [for example,] 1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[12]

90.     The Meta Pixel is a free and publicly available "piece of code" that third-party web developers can install to "measure, optimize and build audiences for … ad campaigns."[13]

---

[11]     *Facebook Unveils Facebook Ads*, META (November 6, 2007), https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/.

[12] Natasha Singer, *What You Don't Know about How Facebook Uses Your Data* (April 11, 2018), https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html.

[13] *Meta Pixel* (2023), https://www.facebook.com/business/tools/meta-pixel.

91.     Meta describes the Pixel as "a snippet of JavaScript code" that "relies on Facebook cookies, which enable [Facebook] to match … website visitors to their respective Facebook user accounts.[14]

92.     Meta pushes advertisers to install the Meta Pixel. Meta tells advertisers the Pixel "can help you better understand the effectiveness of your advertising and the actions people take on your site, like visiting a page or adding an item to their cart."[15]

93.     Meta tells advertisers that the Meta Pixel will improve their Facebook advertising, including by allowing them to:

     a.   "optimize the delivery of your ads" and "[e]nsure your ads reach the people most likely to take action;" and

     b.   "create Custom Audiences from website visitors" and create "[d]ynamic ads [to] help you automatically show website visitors the products they viewed on your website—or related ones."[16]

94.     Meta explains that the Pixel "log[s] when someone takes an action on your website" such as "adding an item to their shopping cart or making a purchase," and the user's subsequent action:

---

[14] *Meta Pixel* (2023), https://developers.facebook.com/docs/meta-pixel/.

[15] *Meta Pixel* (2023), https://www.facebook.com/business/tools/meta-pixel.

[16] *Id.*



Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website. Examples of actions include adding an item to their shopping cart or making a purchase. The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager. From there, you'll be able to see the actions that your customers take. You'll also have options to reach those customers again through future Facebook ads.

95.     The Meta Pixel is customizable and web developers can choose the actions the Pixel will track and measure on a particular webpage.

96.     Meta advises web developers to place the Pixel early in the source code for any given webpage or website to ensure that visitors will be tracked before they leave the webpage or website.[17]

97.     Healthcare providers like Defendant encourage Plaintiffs and Class Members to access and use various digital tools via its Web Properties to, among other things, receive healthcare services, in order to gain additional insights into its Users, improve its return on marketing dollars and, ultimately, increase its revenue.

98.     In exchange for installing the Pixel, Facebook provided Defendant with analytics about the advertisements it placed and tools to target people who visited its Web Properties.

---

[17] *Meta Pixel: Get Started* (2023), *https://developers.facebook.com/docs/meta- pixel/get-started.*

99.     Upon information and belief, Defendant and other companies utilized Plaintiffs' and Class Members' sensitive information and data collected by the Meta Pixels on Defendant's Web Properties in order to advertise to these individuals later on Meta's social platforms.

100.    If a healthcare provider, such as Defendant, installs the Meta Pixel as Meta recommends, patients' actions on the Website are contemporaneously redirected to Meta.

101.    For example, when a patient clicks a button to register for, or logs into or out of, a "secure" patient portal, Meta's source code commands the patient's computing device to send the content of the patient's communication to Meta while the patient is communicating with their healthcare provider.

102.    By design, Meta receives the content of a patient's portal log in communication immediately when the patient clicks the button to access the log-in page—even before the healthcare provider. [18]

103.    Thus, the Meta "pixel allows Facebook to be a silent third-party watching whatever you're doing,"[19] which in this case included the content of Defendant's patients' communications with its Website, including their PHI.

---

[18] At the time of filing this complaint, Plaintiffs are unable to determine whether Pixels were embedded inside Defendant's MyChart Portal. However, given Defendant's use of the Meta Pixel on other pages of the Website *including the log-in page for its patient Portal*, Plaintiffs reasonably believe and, therefore, aver upon information and good faith belief that Defendant used the Pixels to track information on its entire digital platform, including inside its MyChart Portal. *See also*, Todd Feathers, *et al.*, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022) (listing examples of hospitals that used third party trackers inside password-protected patient portals), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

[19] Jefferson Graham, *Facebook spies on us but not by recording our calls. Here's how the social network knows everything* (Apr. 4, 2020), https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/.

104.    For Facebook, the Pixel acts as a conduit of information, sending the information it collects to Facebook through scripts running in the User's internet browser, via data packets labeled with PII, including the User's IP address, the Facebook c_user cookie and third-party cookies allowing Facebook to link the data collected by Meta Pixel to the specific Facebook user.[20]

105.    A recent investigation by The Markup revealed that the Meta Pixel was installed inside password-protected patient portals of at least seven U.S. health systems, giving Facebook access to even more patient communications with their providers.[21]

106.    David Holtzman, a health privacy consultant was "deeply troubled" by the results of The Markup's investigation and indicated "it is quite likely a HIPAA violation" by the hospitals, such as Defendant.[22]

107.    Facebook's access to use even only some of these data points—such as just a "descriptive" webpage URL—is problematic. As Laura Lazaro Cabrera, a legal officer at Privacy International, explained: "Think about what you can learn from a URL that says something about scheduling an abortion' . . . 'Facebook is in the business of developing algorithms. They know what sorts of information can act as a proxy for personal data."[23]

---

[20] The Facebook Cookie is a workaround to recent cookie-blocking techniques, including one developed by Apple, Inc., to track users. *See* Maciej Zawadziński & Michal Wlosik, *What Facebook's First-Party Cookie Means for AdTech* (June 8, 2022), https://clearcode.cc/blog/facebook-first-party-cookie-adtech/.

[21] *See* Feathers, *supra,* note 19.

[22] *Id.*

[23] Grace Oldham & Dhruv Mehrotra, *Facebook and Anti-Abortion Clinics Are Collecting Highly Sensitive Info on Would-Be Patients*, THE MARKUP (Sept. 25, 2022), https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients.

108.     The collection and use of this data raises serious concerns about user privacy and the potential misuse of personal information. For example, when Users browse Defendant's Website, every step of their activity is tracked. Facebook (and other entities) can learn a chilling level of detail about Users' medical conditions, behavioral patterns, preferences and interests.

109.     This data can be used not only to provide personalized and targeted content and advertising, but also for more nefarious purposes, such as tracking and surveillance. Moreover, the misuse of this data can lead to the spread of false or misleading information, which could have serious consequences, particularly in the case of health-related information.

110.     As pointed out by OCR, impermissible disclosures of such data in the healthcare context "may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI…. This tracking information could also be misused to promote misinformation, identity theft, stalking, and harassment."[24]

111.     Unfortunately, several recent reports detail the widespread use of third-party tracking technologies on hospitals', health care providers' and telehealth companies' digital properties to surreptitiously capture and to disclose their Users' Private Information.[25] Estimates

---

[24] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[25] The Markup reported that 33 of the largest 100 hospital systems in the country utilized the Meta Pixel to send Facebook a packet of data whenever a person clicked a button to schedule a doctor's appointment. Todd Feathers, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, *supra*, note 19.

are that over 664 hospital systems and providers utilize some form of tracking technology on their digital properties.[26]

**B. Google's Collection Tools Redirect Patients' Data from Atrium's Web Properties to Google to Use for Ad Targeting.**

112. Google operates the world's largest internet search engine company and generated roughly $307 billion in revenue in 2023, roughly 76% of which came from selling advertising.[27]

113. Google also tracks people through its widespread internet marketing products and ubiquitous trackers.

114. Google sells advertising space by highlighting its ability to target users.[28] Google can target users so effectively because it surveils user activity both on and off Google sites and apps. This allows Google to make inferences about users beyond what they explicitly disclose, determining audiences by "[users'] activity using Google products and third-party websites, or estimated based on content certain groups of people are likely to be interested in."[29]

---

[26] Dave Muoio & Annie Burky, *Advocate Aurora, WakeMed get served class action over Meta's alleged patient data mining,* FIERCE HEALTHCARE (November 4, 2022), https://www.fiercehealthcare.com/health-tech/report-third-top-hospitals-websites-collecting-patient-data-facebook.

[27] ALPHABET, INC REPORTS FOURTH QUARTER AND FULL YEAR 2023 RESULTS, https://abc.xyz/assets/95/eb/9cef90184e09bac553796896c633/2023q4-alphabet-earnings-release.pdf.

[28] BENEFITS OF ONLINE ADVERTISING AND GOOGLE ADS, https://support.google.com/google-ads/answer/6123875?hl=en#:~:text=Control%20your%20costs,per%20day%2C%20and%20per%20ad.

[29] ABOUT AUDIENCE SEGMENTS, https://support.google.com/google-ads/answer/2497941?sjid=6716156162402223675-NA

24

115.    Google compiles this information into a generalized dataset called "Audience Segments," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[30]

116.    Like Meta, Google utilizes the precise type of information disclosed by Atrium to identify, target and market products and services to individuals.

117.    Like Facebook, Advertisers can select "Custom Audiences"[31] which enable advertisers to reach "your ideal audience by entering relevant keywords, URLs, and apps."[32]

118.    With Custom Audiences, advertisers can target existing customers directly, and they can also build Audiences similar to their existing customers.

119.    As Google puts it, "Google Analytics is a platform that collects data from your websites and apps to create reports that provide insights into your business."[33]

120.    Google Analytics, Google Tag Manager and DoubleClick are bits of code that advertisers can integrate into their websites, mobile applications and servers, thereby enabling Google to intercept and collect user activity on those platforms.

121.    Google explains that Google Analytics can also track and log specific consumer actions, such as clicking a button. These actions are called "events":[34]

---

[30] *Id.*

[31] CUSTOM AUDIENCES,
https://developers.google.com/google-ads/api/docs/remarketing/audience-segments/custom-audiences#how_custom_audiences_work

[32] *Id.*

[33]            HOW            GOOGLE            ANALYTICS            WORKS,
https://support.google.com/analytics/answer/12159447?hl=en

[34] *Id.*

122.    According to Google, "An event allows you to measure a specific interaction or occurrence on your website or app. For example, you can use an event to measure when someone loads a page, clicks a link, or completes a purchase, or to measure system behavior, such as when an app crashes or an impression is served."[35]

123.    The Google Analytics tracker is customizable. Meaning, web developers can choose the events Google Analytics will track and measure.

124.    Google Analytics is automatically configured to capture certain data, like when a User visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[36] Google Analytics can also track other events. Google offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[37] Advertisers can even create their own tracking parameters by building a "custom event." [38]

125.    Google offers this code to advertisers, like Atrium, to integrate into their website. Google Analytics tracks "how many users perform the action and evaluate marketing performance across all channels that lead users to perform the action… A key event is an event that measures an action that's particularly important to the success of your business. When someone triggers the

---

[35]                                 ABOUT                                 EVENTS, https://support.google.com/analytics/answer/9322688?hl=en#zippy=%2Crealtime-report%2Cdebugview-report

[36]      GOOGLE      ANALYTICS      –      THE      FINER      POINTS https://marketingplatform.google.com/about/analytics/features/

[37] *Id.*

[38] *Id.*

event by performing the action, the key event is recorded in Google Analytics and surfaced in your Google Analytics reports."[39]

126. Google pushes advertisers to install Google Analytics. Google says Analytics "can track what online behavior led to purchases and use that data to make informed decisions about how to reach new and existing customers."[40]

127. Google tells advertisers that Google Analytics will improve their Google advertising through the following features:

     i.   "Collects both website and app data to better understand the customer journey;

    ii.   Uses event-based data instead of session-based;

   iii.   Includes privacy controls such as cookieless measurement and behavioral and key event modeling;

   iv.   Predictive capabilities offer guidance without complex models;

    v.   Direct integrations to media platforms help drive actions on your website or app."[41]

---

[39]GOOGLE ANALYTICS HELP - ABOUT KEY EVENTS, https://support.google.com/analytics/answer/9267568?hl=en.

[40] GOOGLE ANALYTICS HELP – THE VALUE OF DIGITAL ANALYTICS, https://support.google.com/analytics/answer/12159453?hl=en&sjid=8517741530658858223-NA&visit_id=638526037873608158-2523537901&rd=2&ref_topic=14089939

[41] GOOGLE ANALYTICS HELP – SET UP ANALYTICS FOR A WEBSITE AND/OR APP https://support.google.com/analytics/answer/9304153?sjid=8517741530658858223-NA

27



### How it works

Let's say someone clicks a link on your tagged website that takes them to an external website. The following illustrates what happens when the user clicks the link:

**1**
The user visits your website and clicks a link to an external website

**2**
Analytics receives the click event and surfaces the event and parameters in the Realtime report

**3**
Analytics fully processes the event

**4**
Analytics surfaces the data in dimensions and metrics used in reports, audiences, etc.

128.    Google advises web developers to place Google tracking code early in the source code for any given webpage or website to ensure that visitors will be tracked before they leave the webpage or website:[42]

### Set up data collection for websites

To begin seeing data in your new Google Analytics 4 property, you'll need to do one of the following:

Add the tag to a website builder or CMS-hosted website (e.g., HubSpot, Shopify, etc.)    ⌄

Add the Google tag directly to your web pages    ⌃

You need access to the HTML for your web pages. Ask your web developer to perform these steps if you're unable to complete the steps yourself.

1. Sign in to your Google Analytics account ⧉ .
2. Click **Admin** ⧉ .
3. At the top of the *Property* column, select your property.
4. In the *Property* column, click **Data streams > Web**.
5. Click the data stream for your website.
6. Under *Google tag*, click **View tag instructions**.
7. On the *Installation instructions* page, select **Install manually**:
   • On the screen, you'll see the JavaScript snippet for your account's Google tag. Your Google tag is the entire section of code that appears, beginning with:

   `<!-- Google tag (gtag.js) -->`

   and ending with

   `</script>`

Paste your Google tag immediately after the `<head>` on each page of your website.

Data collection may take up to 30 minutes to begin. You can then use the Realtime report ⧉ to verify that you're receiving data.

---

[42] *Id.*

129.     Google also provides advertisers with step-by-step instructions for setting up and installing Google tracking code on their website.[43]

130.     If a healthcare provider, such as Atrium, installs Google Analytics as Google recommends, patients' actions on the provider's website are contemporaneously redirected to Google. When a patient clicks a button to register for, or logs into or out of, a "secure" patient portal, Google's source code commands the patient's computing device to send the content of the patient's communication to Google while the patient is communicating with his healthcare provider—traveling directly from the user's browser to Google's server.

131.     By design, Google receives the content of a patient's portal log in communication immediately when the patient clicks button to access the log-in page—even before the healthcare provider.

## C.     Defendant Transmitted a Broad Spectrum of Plaintiffs' & Class Members' PHI to Meta via the Meta Tracking Tools.

132.     Every website is comprised of "Markup" and "Source Code." Markup consists of the pages, images, words, buttons and other features that appear on the patient's screen as they navigate Defendant's Web Properties.

133.     Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code. Source Code is designed to be readable by humans and formatted in a way that developers and other users can understand.

_____

[43] *Id.*

29

134.    In addition to controlling a website's Markup, Source Code executes a host of other programmatic instructions including the ability to command a website user's browser to send data transmissions to third parties like Facebook, via the Meta Pixel.[44]

135.    Defendant's Pixel, embedded in its JavaScript Source Code on the Website, manipulates a User's browser by secretly instructing it to duplicate a User's communications (HTTP Requests) and sending those communications to Facebook.

136.    This occurs because the Pixel is programmed to automatically track and transmit Users' communications, and this occurs contemporaneously, invisibly and without the Users' knowledge.

137.    Defendant's Source Code commands a patient's browser to re-direct their actions on the Website (characterized as "Event Data" by the Pixel), which contain PHI, through the HTTPS protocol to Meta at a Meta "endpoint," i.e., a URL at a domain controlled by Meta that exists for the purpose of acquiring such information.

138.    The information Defendant sent to Meta from its use of the Meta Pixel and other tracking tools includes, but is not limited to, the following:

      a.   exact search terms entered by a User on the Website, including searches for their medical symptoms and conditions, specific medical providers and their specialty and treatments sought;

      b.   descriptive URLs that describe the categories of the Website, categories that describe the current section of the Website and the referrer URL that caused navigation to the current page;

      c.   communications a User exchanges through Defendant's Web Properties by clicking and viewing webpages including communications about providers and specialists, conditions and treatments, along with the timing of those communications including, upon information and good faith belief, whether they are made while a User is logged in to the Patient Portal or around

---

[44] These Pixels or web bugs are tiny image files that are invisible to website users. They are purposefully designed in this manner, or camouflaged, so that users remain unaware of them.

the same time that the User has scheduled an appointment, called the medical provider or clicked to log into the Patient Portal;

d. when a User sets up or schedules an appointment;

e. information that a User clicks on in an appointment form;

f. when a User clicks a button to call the provider from a mobile device directly from Defendant's Website;

g. when a User clicks to access the Patient Portal login page and accesses other patient-dedicated web pages; and

h. communications that patients exchange with health insurance companies, pharmacies and prescription drug companies.

139. Defendant hands patients a tapped device and once one of its webpages is loaded into the User's browser, the software-based wiretap quietly waits for private communications on the webpage to trigger the tap and transmits them to unauthorized third parties such as Facebook.

140. For example, when a patient visits the Website and enters "heart disease," "diabetes" or "stroke rehabilitation" into the search bar, their browser automatically sends an HTTP request to Defendant's web server. Defendant's web server automatically returns an HTTP response, which loads the Markup for that particular webpage.

141. The patient visiting this particular webpage only sees the Markup, not Defendant's source code or underlying HTTP Requests and Responses.

142. Defendant's Source Code and underlying HTTP Requests and Responses historically shared the patient's personal information with Facebook, including the fact that a User was looking for treatment for their heart disease, diabetes or stroke diagnosis—along with their unique personal identifiers.

143.    Data privacy experts are capable of viewing how the Meta Pixel operates on various

websites, including past configurations and expert analysis demonstrates how Atrium used the

Pixels on its Website. The first screenshot below shows what a webpage from Defendant's Web

Properties looks like when you use the Meta Pixel Helper to see how the Pixel operates.



144.    On the left-hand side of the screenshot is the page as it appears to any User visiting

it. This is the result the User would see if they went to Atrium's search bar, typed in "cancer" and

pressed Enter. There are 1,527 matches for that search on Defendant's Website.

145.    The right-hand side, also displayed below, uses the Google Chrome "Inspect" tool

to reveal what information Defendant discloses to Meta unbeknownst to the User.



146.    Defendant discloses the exact terms of patients' search queries on its Website via

the "search bar" function.

147.    Below are larger images of the Meta pixel in action. Though it appears to be code, a closer inspection makes it apparent that Defendant is disclosing both personally identifiable information in the form of the c_user FID, which uniquely identifies an individual's Facebook account (as well as other cookies that Facebook is known to utilize to identify individuals).





148.    The highlighted portions show some of the categories of information that Defendant shares with Meta. Beginning at the top, the "id=4768…" is the unique ID number of one of the Pixels installed by Defendant. Next to that is "PageView," a type of 'event' collected by the Pixel as the User navigates the Website which shares the URL of the page that the User is visiting.  On the top line, Defendant discloses that the User is visiting "atriumhealth.org." As demonstrated by the images below and as Plaintiffs' research showed, Defendant discloses the descriptive URL of any treatment-specific page visited next (for example, https://atriumhealth.org/medical-services/prevention-wellness/behavioral-health or https://atriumhealth.org/medical-services/prevention-wellness/womens-health/maternity-services#classes), type of provider sought (for example, "obstetrics and gynecology" via https://atriumhealth.org/find-a-doctor/results?new_patient=true&skill=specialty-33-obstetrics-and-gynecology&sort=best_match), or the fact that the patient is making an appointment (for example,

via https://atriumhealth.org/make-an-appointment).

149.    In the image below, Defendant discloses that the User performed a "search" and the "keywords" they typed in for that search were "cancer."  As the page loads, the Meta Pixel triggers the "PageView" event, automatically sending information such as the URL—which contains the User's exact search keywords—to Meta. Now Meta knows that the User is searching for information related to the condition and treatment of cancer, PHI that is protected by HIPAA.





150. The line which begins with "Cookie" contains the PII disclosed to Meta that allows Meta to specifically associate the PHI shared in the earlier lines with a specific individual.

151. The first highlighted term is the "c_user" cookie followed by a number which contains the unique Facebook User ID for the person who is visiting this webpage.

152. This user ID, or FID, can be used to easily find the Facebook account of any user. If you have a person's FID (for example, FID 12345), all you have to do is add it to the Facebook URL to find the profile. In our example, it would be: facebook.com/12345.

153.    The image below shows some of the Facebook cookies which contain unique personal identifiers that the Meta Pixel collects along with patients' PHI that get disclosed to Meta (here, when the patient is attempting to make an appointment):



154.    The first is the c_user cookie. The second is a "datr" cookie which contains a unique alphanumeric code and identifies the specific web browser from which the User is sending the communication. It is an identifier that is unique to the User's web browser and is therefore a means of identification for Meta. Meta keeps a record of every datr cookie identifier associated with each of its users. The third is the "fr" cookie, a unique combination of the c_user and datr cookies.

155.    Meta, at the very least, uses c_user, datr and fr cookies to identify individual Facebook users and track their activity across the internet.

156.    Expert analysis has determined that Atrium had active Pixels on its Website from at least 2017 until at least October 2022. Using the Pixels installed on its Website, Atrium transmitted PageView, Microdata and SubscribedButtonClick events about Users' activities.

157.    Upon a User's arrival on Atrium's homepage, Atrium immediately sent a pair of PageView and Microdata events to Facebook revealing that the User was on the page.

158.    As Users navigated beyond the homepage, Atrium continued to disclose User data including Users': (i) keyword search activities; (ii) appointment activities; (iii) medical conditions and treatment sought; (iv) patient status and (v) MyChart login activities, at the very least.

37

159.    Atrium used the Pixel to track Plaintiffs and Class Members when they made appointments with specific providers. This is indicated by the exemplary screenshots below, which show how the action of clicking "Make an Appointment" (via a "SubscribedButtonClick" event set up by Atrium that captures the text of buttons clicked by Users) was transmitted to Meta simultaneously with the user's FID (contained within the c_user cookie, redacted for this public filing) and prior searches for "cancer."

160.    When the User made an appointment with a healthcare provider at Atrium, their unique, personally identifiable FID, linked to their medical need for a specific healthcare appointment, was disclosed to Meta, thereby transmitting PHI to Meta.



*Figure 1: An example of a HTTP communication session sent by the Pixel from the User's device to Facebook that reveals the User's search for "cancer"*



*Figure 2. An easier-to-read representation of the User's c_user ID sent to Facebook when a User enters a new page of Defendant's website.*



161.  In recent months, following a wave of negative press and litigation against other healthcare companies for the same unlawful activities, Defendant removed the Meta Pixel from its Web Properties and has re-configured its source code.

162.  However, because of the way Defendant's source code operated with the embedded Meta Pixel prior to removing the Pixel, when Plaintiff Roberts used the search bar on the Website

39

to look for medical treatments for ████████████, her exact search terms (including ███████████████████████) were transmitted by Defendant's Pixel to Meta, disclosing her specific medical conditions.

163. Similarly, when Plaintiff Sigmon used the search bar on the Website to look up her medical conditions and potential treatments for it (including ███████████████████ ████) were transmitted by Defendant's Pixel to Meta, disclosing her specific medical conditions.

164. When Plaintiffs and Class Members clicked on Defendant's "Medical Services" tab, it took them to the list of services offered for Users in need of various medical treatments. On those pages the User can further narrow their search results by services offered by Defendant.

165. The User's selections and filters were transmitted to Facebook via the Meta Pixels, even if they contained the User's treatment, procedures, medical conditions or related queries, without alerting the User. The communications Defendant sent to Facebook contained the User's Private Information and personal identifiers, including but not limited to their IP address, Facebook ID and datr and fr cookies, along with the search filters the User selected.

166. For example, a diabetes patient in search of diabetes services can search for various treatment options and information, from "endocrinology clinic" and "diabetes prevention" to resources intended to help patients.[45]

167. When the Pixels were embedded on Defendant's Website, from the moment the patient began searching for diabetes treatment their selections or search parameters were automatically transmitted by the Pixel to Facebook along with the User's personal identifiers.

168. The transmission identified the User as a patient (i) seeking medical care from Defendant; (ii) who has diabetes and (iii) who was searching for diabetes services.

---

[45] *See Atrium Health Endocrinology,* ATRIUM HEALTH, https://atriumhealth.org/locations/detail/atrium-health-endocrinology-union-west.

40

169.    If the patient chose to click the phone number for Defendant's flagship hospital, Carolinas Medical Center, that action was shared with Meta as well, via a "SubscribedButtonClick" event which captured the phone number of the clinic accessed.

170.    If the patient selected other services, those search parameters were also automatically transmitted to Facebook by Defendant's Pixel, along with their personal identifiers.

171.    For example, after Plaintiff Sigmon's ███████, she looked up information and appointments through Defendant's Website.

172.    This information would have been disclosed to Facebook (and likely other unauthorized third parties at least in the form of a descriptive URL, ████████████████████████████████████████████, along with Plaintiff Sigmon's unique personal identifiers including her Facebook ID and IP address.

173.    For Plaintiff Roberts, Defendant would have disclosed that starting in May 2020 she was looking up ██████████, including but not limited to sharing the descriptive URL ███████████████████████████████████████ that she visited on Defendant's Website.

174.    By using the Pixels it installs on its Website, Defendant intercepted the PII and PHI of every User that visits every webpage, with the specific purpose of disclosing that HIPAA-protected health information to Meta.

175.    Meta, which created the Pixel and assigns a unique FID to each of its account holders, knows how to combine the information intercepted and shared by Defendant so that Meta can connect each User to the PHI that is disclosed.

176.    The Pixel intercepted and disclosed the information of every Facebook user that visited Defendant's Website in the same way.

41

**D. Atrium Improperly Disclosed Plaintiffs' & Class Members' Private Information to Google.**

177. During the same time period that Atrium installed and ran the Meta Pixel on its Website, Atrium also permitted Google to intercept patient's Private Information. On information and belief, at Atrium's direction, Google intercepted substantially the same information as Facebook throughout Atrium's Website. Plaintiffs include a few representative examples below.

178. Atrium utilized Google advertisements and intentionally installed the Google Collection Tools on its Web Properties, including but not limited to Google Analytics, Google Tag Manager and DoubleClick Ad trackers.

179. On information and good faith belief, Atrium installed a Google Analytics tracker, Google Tag Manager and DoubleClick Ad trackers for a longer period of time than the Meta Collection Tools, the exact dates of which will be a subject of discovery.

180. Based on initial expert analysis and publicly available archives, from at least February 2, 2010 through October 17, 2022, Atrium installed a Google Universal Analytics tracker. Atrium also installed Google DoubleClick Ads from at least April 13, 2017 through October 31, 2021 (but possibly as late as September 9, 2022).

181. Google offers "Custom Audiences," which Atrium installed and customized on its Website.

182. When Google Analytics is imbedded in the Website's source code, Google instructs a user's browser to transmit a contemporaneous and secret transmission to Google which contains the original GET request sent to the host website, along with additional data that Google Analytics is configured to collect. This transmission is initiated by the Google code installed by Atrium and concurrent with the patients' communications with the host website. Two sets of code are thus

42

automatically run as part of the browser's attempt to load and read Atrium's Website—Atrium's own code, and the Google code Atrium embedded.

183. Atrium, through its installation and use of Google Analytics, disclosed to Google the content of patient communications while its patients were exchanging communications with Atrium's Web Properties, which Google used to target patients with ads.

184. Atrium also used Google Analytics to transmit similar contents of communications as Facebook by intercepting the same or similar, highly confidential "events" that a user interacted with on the Website.

185. Defendant installed a Google Tag Manager container with ID GTM-MF4MN9 ("GTM1"). Through GTM1, Defendant disclosed Users' Private Information to Google as they navigated the Website, disclosing Users' browsing activities as they (i) viewed the patient portal; (ii) booked appointments; (iii) requested medical and billing records and (iv) clicked to pay bills.

186. Demonstrative events that Defendant previously sent to Google may be viewed by using an archive of GTM1 as configured on October 17, 2022.

187. When Users clicked to access the Portal, Defendant sent a custom Google event revealing that the user clicked to navigate to the "MyAtriumHealth - /MyAtriumHealth/Authentication/Login" page.

43





188.    Defendant also disclosed when Users made appointments through the Website by sending a PageView event when the User loaded the Make an Appointment page.

189.    Defendant then disclosed as a User navigated from the Make an Appointment page to (i) schedule an appointment as a new patient or an existing patient; (ii) start an urgent care video

visit; (iii) have an eVisit; (iv) reserve a spot at urgent care or (v) call Defendant for assistance with scheduling an appointment. Below is demonstrative screenshot of how a new patient's Private Information would have been shared through Defendant's use of Google Collection Tools:





190.     Defendant additionally disclosed when Users took steps to request medical records. Upon a User loading the Medical Records page, Defendant would inform Google that the User was on the page "for-patients-visitors/medical-records." From that page, Defendant would inform Google as Users navigated to learn how to request (i) records electronically or by paper or (ii) other types of records. Below is demonstrative screenshot of how a new patient's Private Information would have been shared through Defendant's use of Google Collection Tools:





191.    Users could also request their billing records from the Medical Records page. And Defendant would inform Google as the User navigated to learn about their billing records.

192.    Defendant also informed Google when a user clicked to pay their bills, informing it that the user clicked to "Make a Payment,"- /MyAtriumHealth/Billing/GuestPay/PayAsGuest."





**E.** *Defendant's Website Sent Plaintiffs' and Class Members' PHI to Facebook and Google Along with Unique Personal Identifiers.*

193. Defendant's Meta Collection Tools, Google Collection Tools and other third-party trackers sent sensitive Private Information to Facebook and Google, including but not limited to Plaintiffs' and Class Members' (i) status as medical patients; (ii) health conditions; (iii) treatments

51

or therapies; (iv) terms and phrases entered into Defendant's search bar; (v) sought providers and their specialties; (vi) selected locations or facilities for treatment and (vii) web pages viewed.

194.    Importantly, the Private Information Defendant's Pixel sent to Facebook and Google was sent alongside Plaintiffs' and Class Members' personal identifiers, including patients' IP address and cookie values such as their unique Facebook ID or Google ID, thereby allowing individual patients' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Facebook or Google accounts.

195.    The Facebook Meta Pixel uses both first-and third-party cookies. A first-party cookie is "created by the website the user is visiting"—i.e., Defendant.[46]

196.    A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook.[47]

197.    The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

198.    Facebook, at a minimum, uses the fr, _fbp and c_user cookies to link to FIDs and corresponding Facebook profiles.

199.    Google uses similar tools to track users of websites with Google tracking code installed, such as Google Analytics.

200.    Universal Analytics tracks, among other types of data, "events" which include instances when a patient downloads a document, engages with a webpage by putting in their login information, or navigates to a certain part of the webpage and clicks a button.

---

[46] This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[47] This is confirmable by tracking network activity.

201.    Google DoubleClick events are linked to Universal Analytics events. Each DoubleClick event includes the Universal Analytics event's 'tid'. The 'tid' is the tag ID of the Universal Analytics tracking code used by Atrium and is how Google identifies Atrium's account.

202.    Each DoubleClick event also includes the 'cid' parameter. The 'cid' parameter is a first-party cookie that helps Google identify Atrium's users.  Consequently, Google can connect DoubleClick and Universal Analytics events with individual users of Atrium's Web Properties.

203.    Plaintiffs never consented, agreed, authorized or otherwise permitted Defendant to disclose their Private Information, nor did they authorize any assistance with intercepting their communications.

204.    Plaintiffs were never provided with any written notice that Defendant disclosed their Private Information nor were they provided any means of opting out of such disclosures.

205.    Despite this, Defendant knowingly and intentionally disclosed Plaintiffs' Private Information to Facebook and Google.

**F.**    ***Defendant Violates Its Promises to Users and Patients to Protect Their Confidentiality.***

206.    Beyond Defendant's legal obligations to protect the confidentiality of individuals' Private Information, Defendant's privacy policies and online representations affirmatively and unequivocally state that any personal information provided to it will remain secure and protected.[48]

207.    Defendant represents to Users that it will only disclose Private Information under certain circumstances, none of which apply here.[49] Defendant's privacy policies do not permit Defendant to use and disclose Plaintiffs' and Class Members' Private Information for marketing.

---

[48] *Privacy Policy*, ATRIUM HEALTH, https://atriumhealth.org/for-patients-visitors/privacy/english
[49] *See id*.

208.    Defendant acknowledges in its Notice of Privacy Practices that "we do not sell your information or get paid by vendors to communicate with you without your written authorization."[50]

209.    Moreover, Defendant represents that it will disclose Users' PHI when required to in limited circumstances. Defendant represents that it may transfer or share User's PHI with "other people and companies, known as business associates, to help us perform services and manage our operations," or "as required by local, state or federal law."[51]

210.    Further, Defendant's Privacy Policy represents: "We understand that your health information is personal and we are committed to protecting your privacy… We are required by law to: Maintain the privacy of your health information as outlined in this Notice"[52]

211.    In its separate Online Privacy Policy, Defendant also separately acknowledges that, "we will not sell your Personal Information without your express permission."[53]

212.    Defendant failed to issue a notice that Plaintiffs' and Class Members' Private Information had been impermissibly disclosed to unauthorized third parties. Defendant never disclosed to Plaintiffs or Class Members that it shared their sensitive and confidential communications, data and Private Information with Meta and other unauthorized third parties.[54]

213.    Through Plaintiffs' payment to Defendant for healthcare services, the terms of Defendant's privacy policies necessarily formed essential terms of its contracts for those services.

---

[50] *See id.*

[51] *See id.*

[52] *See id.*

[53] *Online Privacy Policy*, ATRIUM HEALTH, https://atriumhealth.org/for-patients-visitors/online-privacy-policy.
[54] *See supra*, note 9.

Indeed, Defendant required Plaintiffs to sign acknowledgments of receipt of Defendant's Notice of Privacy Practices prior to receiving any healthcare services, and Plaintiffs understood that as part of their bargain for healthcare services with Defendant, Defendant would keep its promises of confidentiality regarding their sensitive PHI, however it was to be received by Defendant.

214. Defendant unequivocally failed to adhere to a single promise to safeguard Private Information of its Users. Defendant made these privacy policies and commitments available on its Website. Defendant includes these privacy policies and commitments to maintain the confidentiality of its Users' sensitive information as terms of its contracts with those Users, including contracts entered with Plaintiffs and the Class Members. In these contract terms and other representations to Plaintiffs and Class Members and the public, Defendant promised to take specific measures to protect Plaintiffs' and Class Members' Private Information, consistent with industry standards and independent from federal and state law. However, it failed to do so.

215. In an action against Facebook related to its of Pixels on healthcare provider web properties, Facebook explicitly stated it requires Pixel users to "post a prominent notice on every page where the Pixel is embedded and to link from that notice to information about exactly how the Pixel works and what is being collected through it, so it is not invisible."[55] Defendant did not post such a notice.

216. Facebook further stated that "most providers [...] will not be sending [patient information] to Meta because it violates Meta's contracts for them to be doing that."[56]

---

[55] *See* Transcript of the argument on Plaintiff's Motion for Preliminary Injunction in *In re Meta Pixel Healthcare Litig.*, Case No. CV-22-03580-WHO (N.D. Cal. Nov. 9, 2022) (Hon. J. Orrick), at 19:12-18; *see also In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218 (N.D. Cal. Dec 22, 2022).

[56] *Id.* at 7:20-8:11.

217. Despite a lack of disclosure, Defendant allowed third parties to "listen in" on patients' confidential communications and to intercept and use for advertising purposes the very information they promised to keep private, in order to bolster their profits.

**G.** ***Plaintiffs and Class Members Reasonably Believed That Their PHI Would Not Be Shared with Third Parties.***

218. Plaintiffs and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

219. Indeed, at all times when Plaintiffs and Class Members provided their Private Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

220. Personal data privacy and obtaining consent to share Private Information are material to Plaintiffs and Class Members.

221. Plaintiffs and Class Members relied to their detriment on Defendant's uniform representations and omissions regarding protection privacy, limited uses and lack of sharing of their Private Information.

222. Now that their sensitive personal and medical information is in possession of third parties, Plaintiffs and Class Members face a constant threat of continued harm including bombardment of targeted advertisements. Collection and sharing of such sensitive information without consent or notice poses a great threat to individuals by subjecting them to the never-ending threat of identity theft, fraud, phishing scams and harassment.

**H.** ***Plaintiffs and Class Members Have No Way of Determining Widespread Usage of Pixels.***

223. Plaintiffs and Class Members did not realize that tracking Pixels exist because they are invisibly embedded within Defendant's webpages that Users might interact with.[57] Users of Defendant's Web Properties do not receive any stating that Defendant tracks and shares sensitive medical data with Facebook, allowing Facebook and other third parties to subsequently target all Users of Defendant's Website for marketing purposes.

224. Plaintiffs and Class Members trusted Defendant's Web Properties when inputting sensitive and valuable Private Information. Had Defendant disclosed to Plaintiffs and Class Members that every click, every search and every input of sensitive information was being tracked, recorded, collected and disclosed to third parties, Plaintiffs and Class Members would not have trusted Defendant's Web Properties to input such sensitive information.

225. Defendant knew or should have known that Plaintiffs and Class Members would reasonably rely on and trust Defendant's promises regarding the tracking privacy and uses of their Private Information. Furthermore, any person visiting a health website has a reasonable understanding that medical providers must adhere to strict confidentiality protocols and are bound not to share any medical information without their consent.

226. By collecting and sharing Users' Private Information with Facebook and other unauthorized third parties, Defendant caused harm to Plaintiffs and Class Members.

**I. Defendant Knew Plaintiffs' Private Information Included PHI.**

227. By virtue of how the Pixel works, i.e., sending interactions on a website to Facebook, Defendant was aware that its Users' Private Information would be sent to Facebook and Google when they researched specific medical conditions and treatments, looked up providers,

---

[57] *See, e.g.*, FTC Office of Technology, *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FED. TRADE COMM'N (March 16, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking.

made appointments, typed specific medical queries into the search bar and otherwise interacted with the Website—primarily because Defendant had to configure the specific "events" that would be sent to Facebook and Google when they set up those tracking technologies on the Website.

228.    At all times relevant herein Meta notified its partners, including Defendant, to have the rights to collect, use and share user data before providing any data to Meta.[58] Although Meta's intent is questionable, Defendant had been on notice of this Pixel-tracking ever since they activated such Pixel technology on its Website.



**Information from partners.**
Advertisers, app developers, and publishers can send us information through Meta Business Tools they use, including our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel. These partners provide information about your activities off of our Products—including information about your device, websites you visit, purchases you make, the ads you see, and how you use their services —whether or not you have an account or are logged into our Products. For example, a game developer could use our API to tell us what games you play, or a business could tell us about a purchase you made in its store. We also receive information about your online and offline actions and purchases from third-party data providers who have the rights to provide us with your information.

Partners receive your data when you visit or use their services or through third parties they work with. We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us. Learn more about the types of partners we receive data from.

To learn more about how we use cookies in connection with Meta Business Tools, review the Facebook Cookies Policy and Instagram Cookies Policy.

229.    Meta changed this provision again in July 2022, while still requiring partners to have the right to share patient information with Meta:[59]



**How do we collect or receive this information from partners?**

Partners use our Business Tools, integrations and Meta Audience Network technologies to share information with us.

These Partners collect your information when you visit their site or app or use their services, or through other businesses or organizations they work with. We require Partners to have the right to collect, use and share your information before giving it to us.

---

[58] *See In re Meta Pixel Healthcare Litig.*, No. 22-cv-03580-WHO, 2022 U.S. Dist. LEXIS 230754, at *13-14 (N.D. Cal. Dec. 22, 2022).

[59] Meta, *Data Policy: Information from Partners, vendors and third parties* (Jan. 1, 2023), https://www.facebook.com/privacy/policy?subpage=1.subpage.4-InformationFromPartnersVendors.

230.    Defendant had the explicit option to disable the Pixel technology on its Website, but chose not to exercise this option, thereby continuing to share data with Facebook despite the availability of preventive measures. Defendant has the same option with its Google trackers, but it chose to continue sharing data with Google as well—even after taking down the Meta Pixels.

231.    Meta advised third party entities, like Defendant, to refrain from sending any information they did not have the legal right to send and expressly emphasized not to transmit health information. Yet, Defendant, in direct contravention of these disclosures, and despite Defendant's promises to keep all health-related data about patients confidential, employed Pixel tracking on its Website, thereby sharing sensitive patient data without authorization or consent.

## J.  Defendant's Conduct Violates Federal Privacy Laws and Industry Standards.

### 1.  The HIPAA Privacy Rule Protects Patient Healthcare Information.

232.    Patient healthcare information in the United States is protected by federal law under HIPAA and its implementing regulations, which are promulgated by HHS.

233.    The HIPAA Privacy Rule, 45 C.F.R. § 160 and 45 C.F.R. § 164 (A) and (E): "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, healthcare clearinghouses, and those healthcare providers that conduct certain healthcare transactions electronically."[60]

234.    The Privacy Rule broadly defines PHI as "individually identifiable health information" that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

---

[60] The HIPAA Privacy Rule, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html

235. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a healthcare provider, health plan, employer, or healthcare clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of healthcare to an individual; or the past, present, or future payment for the provision of healthcare to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

236. Under the HIPAA de-identification rule, "health information is not individually-identifiable only if: (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

    a. Names;

    b. Medical record numbers;

    c. Account numbers;

    d. Device identifiers and serial numbers;

    e. Web Universal Resource Locators (URLs);

    f. Internet Protocol (IP) address numbers; … and

    g. Any other unique identifying number, characteristic, or code…; and" the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is subject of the information." 45 C.F.R. § 164.514.

237. The HIPAA Privacy Rule requires any "covered entity"—which includes healthcare providers like Atrium—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

238. An individual or corporation violates the HIPAA Privacy Rule if it knowingly: "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually-identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually-identifiable health information … if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320(d)(6).

239. The criminal and civil penalties imposed by 42 U.S.C. § 1320(d)(6) apply directly to Atrium when it is knowingly disclosing IIHI relating to an individual, as those terms are defined under HIPAA.

240. Violation of 42 U.S.C. § 1320(d)(6) is subject to criminal penalties where "the offense is committed with intent to sell, transfer, or use individually-identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320(d)(6)(b). In such cases, an entity that knowingly obtains IIHI relating to an individual "shall be fined not more than $250,000, imprisoned not more than 10 years, or both." 42 U.S.C. § 1320(d)(6)(b)(1).

### 2. HIPAA Protects Patient Status Information.

241. HIPAA also protects against revealing an individual's status as a patient of a healthcare provider.

242. Guidance from HHS confirms that HIPAA protects patient status:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a

61

publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data.… **If such information was listed with health condition, healthcare provision or payment data, such as an indication that an individual was treated at a certain clinic, then this information would be PHI.**[61]

243.     HHS's guidance for marketing communications states that healthcare providers may not provide patient lists for marketing purposes without the consent of every included patient:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or his protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, **covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list**.[62]

244.     HHS has previously instructed that the HIPAA Privacy Rule protects patient status:

a.     "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

b.     "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002);

c.     It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013); and

d.     The only exception permitting a hospital to identify patient status without express written authorization is to "maintain a

---

[61] Office for Civil Rights, *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule* at 5 (emphasis added) (Nov. 26, 2012), https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html.

[62] Marketing, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html

directory of individuals in its facility" that includes name, location, general condition, and religious affiliation when used or disclosed to "members of the clergy" or "other persons who ask for the individual by name." 45 C.F.R. § 164.510(1). Even then, patients must be provided an opportunity to object to the disclosure of the fact that they are a patient. 45 C.F.R. § 164.510(2).

### 3. HIPAA's Protections Do Not Exclude Internet Marketing.

245.    As OCR reminded entities regulated under HIPAA (like Atrium) in its recently issued *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* bulletin:

> Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[63]

246.    **The HHS bulletin reminds covered entities, like Atrium, of their long-standing duty to safeguard PHI**, explicitly noting that "it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors," and proceeding to explain how online tracking technologies violate the same HIPAA privacy rules that have existed for decades.[64]

247.    Disclosures of PHI for online marketing or sales purposes require patient authorization under HIPAA, which Atrium did not obtain here. *See* 45 CFR § 164.508(a)(3) ("a covered entity must obtain an authorization for any use or disclosure of protected health information for marketing, except if the communication is in the form of: (A) a face-to-face communication made by a covered entity to an individual; or (B) a promotional gift of nominal

---

[63] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* (emphasis added) (updated March 18, 2024) (last visited Jun. 19, 2024).

[64] *Id.* (emphasis added).

value provided by the covered entity."); 45 CFR § 164.508(a)(4) ("a covered entity must obtain an authorization for any disclosure of protected health information which is a sale of protected health information, as defined in § 164.501 of this subpart [and] [s]uch authorization must state that the disclosure will result in remuneration to the covered entity.").

248.    As a result, a healthcare provider like Atrium may not disclose PHI to a tracking technology vendor, like Meta or Google, unless it has properly notified Website Users and entered into a business associate agreement with the vendor in question.

249.    Yet Atrium disclosed Plaintiff's and Class Members' PHI without their consent and without a business associate agreement with Meta or Google.

### 4.    *The FTC Act Protects Health Information.*

250.    The FTC has made clear that "health information" is "anything that conveys information—or enables an information—about a consumer's health" and provides an example that location-data alone (such as repeated trips to a cancer treatment facility") "may convey highly sensitive information about a consumer's health."[65]

251.    The FTC joined HHS in notifying HIPAA-covered entities and non-HIPAA-covered entities that sharing such "health information" with Google and Facebook is an unfair business practice under federal law:

> When consumers visit a hospital's website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue

---

[65] Jillson, Elisa, *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, Federal Trade Commission (July 25, 2023), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases.

64

doing everything in our powers to protect consumers' health information from potential misuse and exploitation."[66]

252. While OCR's guidance on some of these topics was vacated in part, the FTC's guidance remains unchanged and its enforcement actions remain in effect and highly instructive.

**5.** ***Atrium Violated Industry Standards.***

253. A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship, it is a cardinal rule.

254. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

255. AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)

256. AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

257. AMA Code of Medical Ethics Opinion 3.3.2 provides:

---

[66] *FTC and HHS Warn Hospital Systems and Telehealth Providers About Privacy and Security Risks from Online Tracking Technologies*, Federal Trade Commission (July 20, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking.

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must…:(c) release patient information only in keeping ethics guidelines for confidentiality.

**K.    *Plaintiffs and Class Members Have a Reasonable Expectation of Privacy in Their Private Information, Especially with Respect to PHI.***

258.    Plaintiffs and Class Members have a reasonable expectation of privacy in their Private Information, including personal information and sensitive medical information.

259.    HIPAA sets national standards for safeguarding protected health information. For example, HIPAA limits the permissible uses of health information and prohibits the disclosure of this information without explicit authorization. *See* 45 C.F.R. § 164.HIPAA also requires that covered entities implement appropriate safeguards to protect this information. *See* 45 C.F.R. § 164.530(c)(1).

260.    This federal legal framework applies to health care providers, including Defendant.

261.    Given the application of HIPAA to Defendant, Plaintiffs and the members of the Class had a reasonable expectation of privacy over their PHI.

262.    Several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the collection and unauthorized disclosure of sensitive medical information from millions of individuals, as Defendant have done here, violates expectations of privacy that have been established as general societal norms.

263.    Privacy polls and studies uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

264.    For example, a recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling

or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[67] Moreover, according to a study by Pew Research Center, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.[68]

265.    Users act consistent with these preferences. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85% of worldwide users and 94% of U.S. users chose not to share data when prompted.[69]

266.    Medical data is even more valuable because unlike other personal information, such as credit card numbers which can be quickly changed, medical data is static. This is why companies possessing medical information, like Defendant, are intended targets of cyber-criminals.[70]

267.    Patients using Defendant's Web Properties must be able to trust that the information they input will be protected.

---

[67] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

[68] *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER (November 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

[69] Margaret Taylor, *How Apple Screwed Facebook*, WIRED (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

[70] Caroline Humer & Jim Finkle, *Your medical record is worth more to hackers than your credit card*, REUTERS (September 24, 2014), https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924.

268.     Furthermore, millions of Americans keep their health information private because it can become the cause of ridicule and discrimination. For instance, despite the anti-discrimination laws, persons living with HIV/AIDS are routinely subject to discrimination in healthcare, employment and housing.[71]

269.     The concern about sharing medical information is compounded by the reality that advertisers view this information as particularly valuable. Having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are born.

270.     As one article put it: "the datafication of family life can begin from the moment in which a parent thinks about having a baby."[72] The article continues, "[c]hildren today are the very first generation of citizens to be datafied from before birth, and we cannot foresee —as yet— the social and political consequences of this historical transformation. What is particularly worrying about this process of datafication of children is that companies like . . . Facebook . . . are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[73]

271.     Other privacy law experts have expressed concerns about the disclosure to third parties of a users' sensitive medical information. For example, Dena Mendelsohn—the former Senior Policy Counsel at Consumer Reports and current Director of Health Policy and Data Governance at Elektra Labs—explained that having your personal health information disseminated

---

[71] Bebe J. Anderson, JD, *HIV Stigma and Discrimination Persist, Even in Health Care*, AMA J. ETHICS (December 2009), https://journalofethics.ama-assn.org/article/hiv-stigma-and-discrimination-persist-even-health-care/2009-12.

[72] Veronica Barassi, *Tech Companies Are Profiling Us From Before Birth*, MIT PRESS READER (January 14, 2021), https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/.

[73] *Id.*

in ways you are unaware of could have serious repercussions, including affecting your ability to obtain life insurance and how much you pay for that coverage, increase the rate you are charged on loans, and leave you vulnerable to workplace discrimination.[74]

272. Defendant surreptitiously collected and used Plaintiffs' and Class Members' Private Information, including highly sensitive medical information, through the Google and Meta Collection Tools in violation of Plaintiffs' and Class Members' privacy interests.

**L.** **_Atrium Was Enriched & Benefitted from the Use of the Pixel & other Tracking Technologies that Enabled the Unauthorized Disclosures Alleged Herein._**

273. Meta advertises its' Pixel as a piece of code "that can help you better understand the effectiveness of your advertising and the actions people take on your site, like visiting a page or adding an item to their cart. You'll also be able to see when customers took an action after seeing your ad on Facebook and Instagram, which can help you with retargeting. And when you use the Conversions API alongside the Pixel, it creates a more reliable connection that helps the delivery system decrease your costs."[75]

274. Retargeting is a form of online marketing that targets users with ads based on previous internet communications and interactions. Retargeting operates through code and tracking pixels placed on a website and cookies to track website visitors and then places ads on other websites the visitor goes to later.[76]

---

[74] _See_ Class Action Complaint, _Jane Doe v. Regents of the Univ. of Cal. d/b/a UCSF Medical Center_, CLASS ACTION (Feb. 9, 2023), https://www.classaction.org/media/doe-v-regents-of-the-university-of-california.pdf.

[75] _What is the Meta Pixel,_ https://www.facebook.com/business/tools/meta-pixel (emphasis added)

[76] _The complex world of healthcare retargeting,_ https://www.medicodigital.com/the-complicated-world-of-healthcare-retargeting/.

69

275.     The process of increasing conversions and retargeting occurs in the healthcare context by sending a successful action on a health care website back to Google and Meta via the Google and Meta Collection Tools embedded on, in this case, Defendant's Website.

276.     Through this process, the Meta Pixel loads and captures as much data as possible when a User loads a healthcare website that has installed the Pixel. The information the Pixel captures, "includes URL names of pages visited, and actions taken - all of which could be potential examples of health information."[77]

277.     In exchange for disclosing the Private Information of their patients, Atrium is compensated by Facebook, Google and likely other third parties in the form of enhanced advertising services and more cost-efficient marketing on their platform.

278.     But companies have started to warn about the potential HIPAA violations associated with using pixels and tracking technologies because many are not HIPAA-complaint or are only HIPAA-compliant if certain steps are taken.[78]

279.     For example, Freshpaint a healthcare marketing vendor, cautioned that "Meta isn't HIPAA-compliant" and "If you followed the Facebook (or other general) documentation to set up your ads and conversion tracking using the Meta Pixel, remove the Pixel now."[79]

---

[77] *Id.*

[78] *See* PIWIK Pro, *The guide to HIPAA compliance in analytics,* https://campaign.piwik.pro/wp-content/uploads/2023/10/The-guide-to-HIPAA-compliance-in-analytics.pdf (explaining that Google Analytics 4 is not HIPAA-compliant).

[79] *Id.*

280.    Medico Digital also warns that "retargeting requires sensitivity, logic and intricate handling. When done well, it can be a highly effective digital marketing tool. But when done badly, it could have serious consequences."[80]

281.    Thus, utilizing the Google and Meta Collection Tools directly benefited Atrium by, among other things, reducing the cost of advertising and retargeting. Atrium's sharing of patients' PHI with Google and Meta therefore provided a commercial gain to Atrium.

**M.    *Plaintiffs' & Class Members' Private Information Has Substantial Value.***

282.    Plaintiffs' and Class Members' Private Information had value, and Defendant's disclosure and interception harmed Plaintiffs and the Class by not compensating them for the value of their Private Information and in turn decreasing the value of their Private Information.

283.    The value of personal data is well understood and generally accepted as a form of currency. It is now incontrovertible that a robust market for this data undergirds the tech economy.

284.    The robust market for Internet user data has been analogized to the "oil" of the tech industry.[81] A 2015 article from TechCrunch accurately noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge."[82] That article noted that the value of a single Internet user—or really, a single user's data—varied from about $15 to more than $40.

285.    This economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis and use. However, the data also has economic value to Internet

---

[80] *The complex world of healthcare retargeting, supra*, note 88.

[81] *See The world's most valuable resource is no longer oil, but data*, https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

[82] *See* https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/.

users. Market exchanges have sprung up where individual users like Plaintiffs herein can sell or monetize their own data. For example, Nielsen Data and Mobile Computer will pay Internet users for their data.[83]

286. Healthcare data is particularly valuable on the black market because it often contains all of an individual's PII and medical conditions as opposed to a single piece of information that may be found in a financial breach.

287. In 2023, the Value Examiner published a report that focused on the rise in providers, software firms and other companies that are increasingly seeking to acquire clinical patient data from healthcare organizations. The report cautioned providers that they must de-identify data and that purchasers and sellers of "such data should ensure it is priced at fair market value to mitigate any regulatory risk."[84]

288. In 2021, Trustwave Global Security published a report entitled Hackers, breaches and the value of healthcare data. With respect to healthcare data records, the report found that they may be valued at up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[85]

289. The value of health data has also been reported extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a

---

[83] *See 10 Apps for Seling Your Data for* Cash, https://wallethacks.com/apps-for-selling-your-data/

[84] *See Valuing Healthcare Data*,
https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthc
are%20Data.pdf.

[85] *See* https://www.imprivata.com/blog/healthcare-data-new-prize-hackers (citing *The Value of Data*,
https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf).

Hidden Multi-Billion Dollar Industry," in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[86]

290.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[87]

291.    The dramatic difference in the price of healthcare data when compared to other forms of private information that is commonly sold is evidence of the value of PHI.

292.    But these rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace. If a criminal can sell other Internet users' stolen data, surely Internet users can sell their own data.

293.    In short, there is a quantifiable economic value to Internet users' data that is greater than zero. The exact number will be a matter for experts to determine.

## TOLLING, CONCEALMENT & ESTOPPEL

294.    The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

295.    Defendant secretly incorporated the Google and Meta Collection Tools into its Website, providing no indication to Users that their User Data, including their Private Information, would be disclosed to unauthorized third parties.

296.    Defendant had exclusive knowledge that the Google and Meta Collection Tools were incorporated on its Website yet failed to disclose that fact to Users or inform them that by

---

[86] *See* https://time.com/4588104/medical-data-industry/.

[87] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

73

interacting with its Website Plaintiffs' and Class Members' User Data, including Private Information, would be disclosed to third parties including Facebook and Google.

297.    Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendant's conduct because the incorporation of Google and Meta Collection Tools is highly technical and there were no disclosures or other indications that would inform a reasonable consumer that Defendant was disclosing and allowing Facebook or Google to intercept Users' Private Information.

298.    The earliest Plaintiffs and Class Members could have known about Defendant's conduct was approximately in June of 2022. Nevertheless, at all material times herein, Defendant falsely represented to Plaintiffs that their health information is not and will not be disclosed to any third party.

299.    As alleged above, Defendant has a duty to disclose the nature and significance of its data disclosure practices but failed to do so. Defendant is therefore estopped from relying on any statute of limitations under the discovery rule.

## CLASS ALLEGATIONS

300.    **Class Definition:** Plaintiffs bring this action on behalf of themselves and on behalf of various classes of persons similarly situated, as defined below, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.:

301.    The Nationwide Class that Plaintiffs seek to represent is defined as:

> **Nationwide Class**: All individuals residing in the United States whose Private Information was disclosed to a third party without authorization or consent through the Meta Collection Tools or Google Collection Tools on Defendant's Web Properties.

302.    The Nationwide Class, is referred to throughout this Complaint as the "Class." Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in

74

which Defendant has a controlling interest, any Defendant's officer or director, any successor or assign and any Judge who adjudicates this case, including their staff and immediate family.

303. **The following people are excluded from the Class:** (1) any Judge or Magistrate presiding over this action and members of their immediate families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors and any entity in which Defendant or its parents have a controlling interest and its current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' and Defendant's counsel and (6) the legal representatives, successors and assigns of any such excluded persons.

304. Plaintiffs reserve the right under Federal Rule of Civil Procedure 23 to amend or modify the Class to include a broader scope, greater specificity, further division into subclasses, or limitations to particular issues.

305. The requirements of Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3) are met in this case.

306. **Numerosity**: The exact number of Class Members is not available to Plaintiffs but individual joinder is impracticable. Hundreds of thousands to millions of people have used Atrium's Web Properties since at least 2015. Members of the Class can be identified through Defendant's records or by other means.

307. **Commonality**: There is a common contention for all Class Members as to whether Defendant disclosed to third parties their Private Information without authorization or lawful authority.

308. **Typicality**: Plaintiffs' claims are typical of the claims of other Class Members in that Plaintiffs and the Class Members sustained damages arising out of Defendant's uniform wrongful conduct and data sharing practices.

309. **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs' claims are made in a representative capacity on behalf of the Class Members. Plaintiffs have no interests antagonistic to the interests of the other Class Members. Plaintiffs have retained competent counsel to prosecute the case on behalf of Plaintiffs and the Class. Plaintiffs and Plaintiffs' counsel are committed to vigorously prosecuting this action on behalf of the Class members.

310. The declaratory and injunctive relief sought in this case includes:

    a. Entering a declaratory judgment against Defendant—declaring that Defendant's interception of Plaintiffs' and Class Members' Private Information is in violation of the law;

    b. Entering an injunction against Defendant:

        i. preventing Defendant from sharing Plaintiffs' and Class Members' Private Information among itself and other third parties;

        ii. requiring Defendant to alert or otherwise notify all Users of its Web Properties of what information is being collected, used and shared;

        iii. requiring Defendant to provide clear information regarding its practices concerning data collection from the Users/patients of Defendant's Web Properties, as well as uses of such data;

        iv. requiring Defendant to establish protocols intended to remove all personal information which has been leaked to Facebook and other third parties and request Facebook/third parties to remove such information

        v. and requiring Defendant to provide an opt out procedure for individuals who do not wish for their information to be tracked while interacting with Defendant's Web Properties.

311. **Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and Class Members, and those questions predominate over any questions that may

76

affect individual Class Members. Common questions and issues for Class members include, but are not necessarily limited to the following:

    a. Whether Defendant's unauthorized disclosure of Users' Private Information was negligent;

    b. Whether Defendant owed a duty to Plaintiffs' and Class Members not to disclose their Private Information to unauthorized third parties;

    c. Whether Defendant breached its duty to Plaintiffs and Class Members not to disclose their Private Information to unauthorized third parties;

    d. Whether Defendant represented to Plaintiffs and the Class that it would protect Plaintiff's and the Class Members' Private Information;

    e. Whether Defendant violated Plaintiffs' and Class Members' privacy rights;

    f. Whether Plaintiffs and Class Members are entitled to actual damages, enhanced damages, statutory damages and other monetary remedies provided by equity and law and

    g. Whether injunctive and declaratory relief, restitution, disgorgement and other equitable relief is warranted.

312. **Superiority:** This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by individual Class Members will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual Class Members to obtain effective relief from Defendant's misconduct. Even if Class Members could mount such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of

77

single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be enhanced, and uniformity of decisions ensured.

313. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a. Whether Defendant misrepresented that it would disclose personal information only for limited purposes that did not include purposes of delivering advertisements or collecting data for commercial use or supplementing consumer profiles created by data aggregators and advertisers;

    b. Whether Defendant's privacy policies misrepresented that it collected and shared User information with third-party service providers only for the limited purpose of providing access to its services;

    c. Whether Defendant misrepresented that it had in place contractual and technical protections that limit third-party use of User information and that it would seek User consent prior to sharing Private Information with third parties for purposes other than provision of its services;

    d. Whether Defendant misrepresented that any information it receives is stored under the same guidelines as any health entity that is subject to the strict patient data sharing and protection practices set forth in the regulations propounded under HIPAA;

    e. Whether Defendant misrepresented that it complied with HIPAA's requirements for protecting and handling Users' PHI;

    f. Whether Defendant breached its contractual obligations to not share Users' PHI without express written authorization;

    g. Whether Defendant shared the Private Information that Users provided to Defendant with advertising platforms, including Facebook, without adequate notification or disclosure, and without Users' consent, in violation of health privacy laws and rules and its own privacy policy;

    h. Whether Defendant integrated third-party tracking tools, such as Pixels, in its Website that shared Private Information and User activities with third parties for unrestricted purposes, such as advertising, data analytics and commercial purposes;

78

i.   Whether Defendant shared Private Information and activity information with Facebook using Facebook's Pixels on its Web Properties without Users' consent and

j.   Whether Facebook used the information that Defendant shared with it for unrestricted purposes, such as selling targeted advertisements, data analytics and other commercial purposes.

## CAUSES OF ACTION

## COUNT ONE

**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2511(1),** *et seq.*
**Unauthorized Interception, Use and Disclosure**
**(*On Behalf of Plaintiffs & the Nationwide Class*)**

314.   Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

315.   The ECPA prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

316.   The ECPA protects both sending and receipt of communications.

317.   18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

318.   The transmissions of Plaintiffs' PII and PHI to Defendant's Web Properties qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

319.   **Electronic Communications**. The transmission of PII and PHI between Plaintiffs and Class Members and Defendant's Web Properties with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or

79

photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

320. **Content**. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

321. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding PII and PHI, diagnosis of certain conditions, treatment/medication for such conditions and scheduling of appointments, including ███████████████████████████████████████████.

322. Furthermore, Defendant intercepted the "contents" of Plaintiffs' communications in at least the following forms:

    a.   The parties to the communications;

    b.   The precise text of patient search queries;

    c.   PII such as patients' IP addresses, Facebook IDs, browser fingerprints and other unique identifiers;

    d.   The precise text of patient communications about specific doctors;

    e.   The precise text of patient communications about specific medical conditions;

    f.   The precise text of information generated when patients requested or made appointments,

    g.   The precise text of patient communications about specific treatments;

    h.   The precise text of patient communications about scheduling appointments with medical providers;

    i.   The precise text of patient communications about billing and payment;

    j.   The precise text of specific buttons on Defendant's Website that patients click to exchange communications including Log-Ins, Registrations, Requests for Appointments, Search and other buttons;

k. The precise dates and times when patients click to Log-In on Defendant's Web Properties;

l. The precise dates and times when patients visit Defendant's Web Properties;

m. Information that is a general summary or informs third parties of the subject of communications that Defendant sends back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment and other information.

323. For example, Defendant's interception of the fact that a patient views a webpage like:

https://atriumhealth.org/medical-services/specialty-care/heart-care?isMobileWidget
=false&cityName=&community=All_Communities&locationName=&pageNumber=&pageSize
=10&latitude=35.2270869&longitude=-80.8431267&sortBy=&datasource=5c4b1d04-706d-
45ae-81e1-66f1add7b7f5&childrensLocationOnly=false&locationType=Heart_Care

involves "content," because it communicates that patient's request for the information on that page.

324. **Interception**. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

325. **Electronical, Mechanical or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. The cookies Atrium, Meta and Google use to track Plaintiffs' and the Class Members' communications;

b. Plaintiffs' and Class Members' browsers;

c. Plaintiffs' and Class Members' computing devices

d. Defendant's web servers and

81

e. The Meta Pixel, Google Analytics and Google DoubleClick Ads code deployed by Defendant to effectuate the sending and acquisition of patient communications.

326. By utilizing and embedding the Pixel on its Web Properties, Defendant intentionally intercepted, endeavored to intercept and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

327. Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via the Pixel, which tracked, stored and unlawfully disclosed Plaintiffs' and Class Members' Private Information to third parties such as Facebook.

328. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding PII and PHI, treatment, medication and scheduling.

329. This information was, in turn, used by third parties, such as Facebook to 1) place Plaintiffs and Class Members in specific health-related categories and 2) target Plaintiffs and Class Members with advertising associated with their specific health conditions.

330. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

331. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that

the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

332.    Unauthorized Purpose. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, violation of HIPAA and the causes of action described below, among others.

333.    The ECPA provides that a "party to the communication" may liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

334.    Defendant is not a party for purposes to the communication based on its unauthorized duplication and transmission of communications with Plaintiffs and the Class. However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding and interception of Plaintiffs' and Class Members' Private Information does not qualify for the party exemption.

335.    Here, as alleged above, Defendant violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing IIHI to a third party.

336.    HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

337.    Plaintiffs' and Class Members' information that Defendant disclosed to third parties qualifies as IIHI, and Defendant violated Plaintiff's expectations of privacy, and constitutes tortious or criminal conduct through a violation of HIPAA Defendant intentionally used the wire or electronic communications to intercept Plaintiffs Private Information in violation of the law.

338.    Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it: Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and disclosed IIHI to Facebook without patient authorization.

339.    The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

340.    Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Facebook source code was for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

341.    Defendant's acquisition of patient communications that were used and disclosed to Facebook was also done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

    a.  Negligence;

    b.  Breach of express contract;

    c.  Breach of implied contract; and

    d.  Breach of fiduciary duty.

342.    Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class Members' communications about their Private Information on its Web Properties, because it used its participation in these

communications to improperly share Plaintiffs' and Class Members' Private Information with Facebook and third-parties that did not participate in these communications, that Plaintiffs and Class Members did not know was receiving their information, and that Plaintiffs and Class Members did not consent to receive this information.

343.    Here, Defendant violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3), which imposes a criminal penalty for knowingly disclosing IIHI to a third party.

344.    As such, Defendant cannot viably claim any exception to ECPA liability.

345.    Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in learning that:

    a.  Defendant intruded upon, intercepted, transmitted, shared and used their PII and PHI (including information about their medical symptoms, conditions and concerns, medical appointments, healthcare providers and locations, medications and treatments and health insurance and medical bills) for commercial purposes has caused Plaintiffs and the Class Members to suffer emotional distress;

    b.  Defendant received substantial financial benefits from its use of Plaintiffs' and Class Members' PII and PHI without providing any value or benefit to Plaintiffs or Class Members;

    c.  Defendant received substantial, quantifiable value from its use of Plaintiffs' and Class Members' PII and PHI, such as understanding how people use its Web Properties and determining what ads people see on its Web Properties, without providing any value or benefit to Plaintiffs or Class Members;

    d.  Defendant failed to provide Plaintiffs and Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of its patient information and

    e.  The diminution in value of Plaintiffs' and Class Members' PII and PHI and the loss of privacy due to Defendant making sensitive and confidential information, such as patient status, medical treatment and appointments that Plaintiffs and Class Members intended to remain private no longer private.

346.    Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixel to track and utilize Plaintiffs' and Class Members' Private Information for financial gain.

85

347.    Defendant was not acting under color of law to intercept Plaintiffs' and the Class Members' wire or electronic communication.

348.    Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Pixel.

349.    Any purported consent that Defendant received was not valid.

350.    Consumers have the right to rely upon the promises that companies make to them. Defendant accomplished its tracking and retargeting through deceit and disregard, such that an actionable claim may be made, in that it was accomplished through source code that caused third-party Pixels and cookies (including but not limited to the fbp, ga and gid cookies) and other tracking technologies to be deposited on Plaintiffs' and Class members' computing devices as "first-party" cookies that are not blocked.

351.    Defendant's scheme or artifice to defraud in this action consists of:

    a.    the false and misleading statements and omissions in its privacy policy set forth above, including the statements and omissions recited in the claims below; and

    b.    the placement of the 'fbp' cookie on patient computing devices disguised as a first-party cookie on Defendant's Website rather than a third-party cookie from Facebook.

352.    Defendant acted with the intent to defraud in that it willfully invaded and took Plaintiffs' and Class Members' property:

    a.    property rights to the confidentiality of Private Information and their right to determine whether such information remains confidential and exclusive right to determine who may collect and use such information for marketing purposes; and

    b.    property rights to determine who has access to their computing devices.

353.    In sending and in acquiring the content of Plaintiffs' and Class Members' communications relating to the browsing of Defendant's Web Properties, Defendant's purpose was tortious, criminal and designed to violate federal and state legal provisions including a

86

knowing intrusion into a private, place, conversation or matter that would be highly offensive to a reasonable person.

354.    As a result of Defendant's violation of the ECPA, Plaintiffs and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages and attorney's fees and costs.

## COUNT TWO

### BREACH OF EXPRESS CONTRACT
### *(On behalf of Plaintiffs & the Nationwide Class)*

355.    Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

356.    Plaintiffs and Class Members allege they entered into valid and enforceable express contracts or were third-party beneficiaries of valid and enforceable express contracts, with Defendant for the provision of medical and health care services.

357.    Specifically, Plaintiffs and Class Members entered into a valid and enforceable express contract with Defendant when Plaintiffs first received medical care from Defendant.

358.    The valid and enforceable express contracts to provide medical and health care services that Plaintiffs and Class Members entered into with Defendant include Defendant's promise to protect nonpublic, Private Information given to Defendant or that Defendant gathers on their own from disclosure.

359.    Under these express contracts, Defendant and its affiliated healthcare providers, promised and were obligated to: (a) provide healthcare to Plaintiffs and Class Members; and (b) protect Plaintiffs and the Class Members' PII/PHI: (i) provided to obtain such healthcare or (ii)

87

created as a result of providing such healthcare. In exchange, Plaintiffs and Members of the Class agreed to pay money for these services, and to turn over their Private Information.

360.    Both the provision of medical services and the protection of Plaintiffs and Class Members' Private Information were material aspects of these express contracts.

361.    The express contracts for the provision of medical services – contracts that include the contractual obligations to maintain the privacy of Plaintiffs and Class Members' Private Information—are formed and embodied in multiple documents, including (among other documents) Defendant's Privacy Notice.

362.    At all relevant times, Defendant expressly represented in its Privacy Notice, among other things: (i) that "[a]t Atrium Health, we understand that your health information is personal and we are committed to protecting your privacy"; and (ii) that "[b]efore we use or share your health information for a purpose that is not covered by this Notice or required or permitted by law, we will ask for your written permission. For example, we will ask for your authorization . . . to use your health information for marketing purposes, or to share your information in a way that would be considered the sale of health information."[88]

363.    Defendant's express representations, including, but not limited to, express representations found in their Privacy Notice, formed and embodied an express contractual obligation requiring Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiffs' and Class Members' Private Information.

364.    Consumers of healthcare value their privacy, the privacy of their dependents and the ability to keep their Private Information associated with obtaining healthcare private. To customers such as Plaintiffs and Class Members, healthcare that does not adhere to industry

---

[88] https://atriumhealth.org/for-patients-visitors/privacy/english

88

standard data security protocols to protect Private Information is fundamentally less useful and less valuable than healthcare that adheres to industry-standard data security.

365. Plaintiffs and Class Members would not have entered into these contracts with Defendant or its affiliated healthcare providers as a direct or third-party beneficiary without an understanding that their Private Information would be safeguarded and protected.

366. A meeting of the minds occurred, as Plaintiffs and Members of the Class agreed to and did provide their Private Information to Defendant or its affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, both the provision of healthcare and medical services and the protection of their Private Information.

367. Plaintiffs and Class Members performed their obligations under the contract when they paid for their health care services and provided their Private Information.

368. Defendant materially breached its contractual obligation to protect the nonpublic Private Information Defendant gathered when it disclosed that Private Information to Google and Meta through the Google and Meta Collection Tools, including the Meta Pixel, Google Analytics and Google DoubleClick Ads on its Web Properties.

369. Defendant materially breached the terms of these express contracts, including, but not limited to, the terms in the relevant Privacy Notice. Defendant did not maintain the privacy of Plaintiffs' and Class Members' Private Information as evidenced by Defendant's sharing of that Private Information with Google and Meta through the Google and Meta Collection Tools, including the Meta Pixel, Google Analytics and Google DoubleClick Ads on its Web Properties.

370. The mass and systematic disclosure of Plaintiffs' and Class Members' Private Information to third parties, including Google and Meta, was a reasonably foreseeable consequence of Defendant's actions in breach of these contracts.

371.    As a result of Defendant's failure to fulfill the data privacy protections promised in these contracts, Plaintiffs and Class Members did not receive the full benefit of the bargain and instead received healthcare services that were of a diminished value.

372.    Plaintiffs and Class Members were damaged in an amount at least equal to the difference in the value of the healthcare with data privacy protection they paid for and the healthcare they received.

373.    Had Defendant disclosed that its data privacy was inadequate or that it did not adhere to industry-standard privacy measures, neither Plaintiffs, Class Members nor any reasonable person would have purchased healthcare from Defendant or its affiliated healthcare providers.

374.    As a direct and proximate result of the disclosure of Plaintiffs' and Class Members' Private Information to Google and Meta, Plaintiffs and Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including without limitation the release and disclosure of their Private Information, the loss of control and diminution in value of their Private Information, the imminent risk of suffering additional damages in the future, disruption of their medical care and treatment, out-of-pocket expenses and the loss of the benefit of the bargain they struck with Defendant.

375.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the disclosure of Plaintiffs' and Class Members' Private Information to Google and Meta.

# COUNT THREE

## BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING
### *(On behalf of Plaintiffs & the Nationwide Class)*

376.     Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

377.     Plaintiffs and Class Members allege they entered into valid and enforceable express contracts or were third-party beneficiaries of valid and enforceable express contracts, with Defendant for the provision of medical and health care services.

378.     Specifically, Plaintiffs and Class Members entered into a valid and enforceable express contract with Defendant when Plaintiffs first received medical care from Defendant.

379.     The valid and enforceable express contracts to provide medical and health care services that Plaintiffs and Class Members entered into with Defendant include Defendant's implied duty of good faith and fair dealing, particularly due to Defendant's special relationship with Plaintiffs as their healthcare provider.

380.     Under these express contracts, Defendant and its affiliated healthcare providers, promised and were obligated to provide healthcare to Plaintiffs and Class Members. In exchange, Plaintiffs and Members of the Class agreed to pay money for these services, and to turn over their Private Information.

381.     In service of its implied duty of good faith and fair dealing when executing the contract, Defendant was bound to not voluntarily divulge Plaintiffs' and Class Members' sensitive, non-public Private Information to third parties for monetary gain without Plaintiff's and Class Members' consent to such disclosures.

382.     The express contracts for the provision of medical services are formed and embodied in multiple documents.

91

383.    As evidence of Defendant's knowledge of its obligations to perform the contracts in accordance with its implied duty of good faith and fair dealing and Plaintiffs' expectations of Defendant to do the same, at all relevant times, Defendant expressly represented in its Privacy Notice, among other things: (i) that "[a]t Atrium Health, we understand that your health information is personal and we are committed to protecting your privacy"; and (ii) that "[b]efore we use or share your health information for a purpose that is not covered by this Notice or required or permitted by law, we will ask for your written permission. For example, we will ask for your authorization . . . to use your health information for marketing purposes, or to share your information in a way that would be considered the sale of health information."[89]

384.    Defendant's express representations, including, but not limited to, express representations found in their Privacy Notice, evidence Defendant's knowledge of the specific manifestations of its duty to perform the contracts in accordance with its implied duty of good faith and fair dealing, which required Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiffs' and Class Members' Private Information.

385.    Consumers of healthcare value their privacy, the privacy of their dependents and the ability to keep their Private Information associated with obtaining healthcare private. To customers such as Plaintiffs and Class Members, healthcare that does not adhere to industry standard data security protocols to protect Private Information is fundamentally less useful and less valuable than healthcare that adheres to industry-standard data security.

386.    Plaintiffs and Class Members would not have entered into these contracts with Defendant or its affiliated healthcare providers as a direct or third-party beneficiary without an understanding that their Private Information would be safeguarded and protected.

---

[89] https://atriumhealth.org/for-patients-visitors/privacy/english.

387.    A meeting of the minds occurred, as Plaintiffs and Members of the Class agreed to and did provide their Private Information to Defendant or its affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, both the provision of healthcare and medical services and, through Defendant's implied duty of good faith and fair dealing, the protection of their Private Information.

388.    Plaintiffs and Class Members performed their obligations under the contract when they paid for their health care services and provided their Private Information.

389.    Defendant did not maintain the privacy of Plaintiffs' and Class Members' Private Information as evidenced by Defendant's sharing of that Private Information with Google and Meta through the Google and Meta Collection Tools, including the Meta Pixel, Google Analytics and Google DoubleClick Ads on its Web Properties.

390.    Defendant breached its implied duty of good faith and fair dealing to protect the nonpublic Private Information Defendant gathered when it disclosed that Private Information to Meta through the Google and Meta Collection Tools, including the Meta Pixel, Google Analytics and Google DoubleClick Ads on its Web Properties.

391.    The mass and systematic disclosure of Plaintiffs' and Class Members' Private Information to third parties, including Google and Meta, was a reasonably foreseeable consequence of Defendant's actions in breach of its implied duty of good faith and fair dealing.

392.    Due to Defendant's failure to fulfill the data privacy protections inherent in the special relationship with Plaintiffs and the Class Members, and resulting breach of its implied duty of good faith and fair dealing, Plaintiffs and Members of the Class did not receive the full benefit of the bargain and instead received healthcare and other services that were of a diminished value.

393. Plaintiffs and Class Members were damaged in an amount at least equal to the difference in the value of the healthcare with data privacy protection they paid for and the healthcare they received.

394. Had Defendant disclosed that its data privacy was inadequate or that it did not adhere to industry-standard privacy measures, neither Plaintiffs, Class Members nor any reasonable person would have purchased healthcare from Defendant or its affiliated healthcare providers.

395. As a direct and proximate result of the disclosure of Plaintiffs' and Class Members' Private Information to Google and Meta, Plaintiffs and Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including without limitation the release and disclosure of their Private Information, the loss of control and diminution in value of their Private Information, the imminent risk of suffering additional damages in the future, disruption of their medical care and treatment, out-of-pocket expenses and the loss of the benefit of the bargain they had struck with Defendant.

396. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the disclosure of Plaintiffs' and Class Members' Private Information to Google and Meta.

## COUNT FOUR

### BREACH OF IMPLIED CONTRACT
### *(On behalf of Plaintiffs & the Nationwide Class)*

397. Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

398.   Plaintiffs and Class Members allege they entered into valid and enforceable implied contracts or were third-party beneficiaries of valid and enforceable implied contracts, with Defendant for the provision of medical and health care services.

399.   Specifically, Plaintiffs and Class Members entered into a valid and enforceable contract with Defendant when Plaintiffs first received medical care from Defendant.

400.   The valid and enforceable contracts to provide medical and health care services that Plaintiffs and Class Members entered into with Defendant include Defendant's promise to protect nonpublic, Private Information given to Defendant or that Defendant gathers on their own from disclosure.

401.   Under these contracts, Defendant and its affiliated healthcare providers, promised and were obligated to: (a) provide healthcare to Plaintiffs and Class Members; and (b) protect Plaintiffs and the Class Members' PII/PHI: (i) provided to obtain such healthcare or (ii) created as a result of providing such healthcare. In exchange, Plaintiffs and Members of the Class agreed to pay money for these services, and to turn over their Private Information.

402.   Both the provision of medical services and the protection of Plaintiffs and Class Members' Private Information were material aspects of these contracts.

403.   The contracts for the provision of medical services – contracts that include the contractual obligations to maintain the privacy of Plaintiffs and Class Members' Private Information—are formed and embodied in multiple documents, including (among other documents) Defendant's Privacy Notice.

404.   At all relevant times, Defendant expressly represented in its Privacy Notice, among other things: (i) that "[a]t Atrium Health, we understand that your health information is personal and we are committed to protecting your privacy"; and (ii) that "[b]efore we use or share your

health information for a purpose that is not covered by this Notice or required or permitted by law, we will ask for your written permission. For example, we will ask for your authorization . . . to use your health information for marketing purposes, or to share your information in a way that would be considered the sale of health information."[90]

405. Defendant's express representations, including, but not limited to, express representations found in their Privacy Notice, formed and embodied an express contractual obligation requiring Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiffs' and Class Members' Private Information.

406. Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Information associated with obtaining healthcare private. To customers such as Plaintiffs and Class Members, healthcare that does not adhere to industry standard data security protocols to protect Private Information is fundamentally less useful and less valuable than healthcare that adheres to industry-standard data security. Plaintiffs and Class Members would not have entered into these contracts with Defendant or its affiliated healthcare providers as a direct or third-party beneficiary without an understanding that their Private Information would be safeguarded and protected.

407. A meeting of the minds occurred, as Plaintiffs and Members of the Class agreed to and did provide their Private Information to Defendant or its affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, both the provision of healthcare and medical services and the protection of their Private Information.

408. Plaintiffs and Class Members performed their obligations under the contract when they paid for their health care services and provided their Private Information.

---

[90] https://atriumhealth.org/for-patients-visitors/privacy/english.

409.    Defendant materially breached its contractual obligation to protect the nonpublic Private Information Defendant gathered when it disclosed that Private Information to Google and Meta through the Google and Meta Collection Tools, including the Meta Pixel, Google Analytics and Google DoubleClick Ads on its Web Properties.

410.    Defendant materially breached the terms of these contracts, including, but not limited to, the terms stated in the relevant Privacy Notice. Defendant did not maintain the privacy of Plaintiffs' and Class Members' Private Information as evidenced by Defendant's sharing of that Private Information with Meta through the Google and Meta Collection Tools, including the Meta Pixel, Google Analytics and Google DoubleClick Ads on its Web Properties.

411.    The mass and systematic disclosure of Plaintiffs' and Class Members' Private Information to third parties, including Google and Meta, was a reasonably foreseeable consequence of Defendant's actions in breach of these contracts.

412.    As a result of Defendant's failure to fulfill the data privacy protections promised in these contracts, Plaintiffs and Members of the Class did not receive the full benefit of the bargain, and instead received healthcare and other services that were of a diminished value to that described in the contracts. Plaintiffs and Class Members therefore were damaged in an amount at least equal to the difference in the value of the healthcare with data privacy protection they paid for and the healthcare they received.

413.    Had Defendant disclosed that its data privacy was inadequate or that it did not adhere to industry-standard privacy measures, neither Plaintiffs, Class Members nor any reasonable person would have purchased healthcare from Defendant or its affiliated healthcare providers.

414.     As a direct and proximate result of the disclosure of Plaintiffs' and Class Members' Private Information to Google and Meta, Plaintiffs and Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including without limitation the release and disclosure of their Private Information, the loss of control and diminution in value of their Private Information, the imminent risk of suffering additional damages in the future, disruption of their medical care and treatment, out-of-pocket expenses and the loss of the benefit of the bargain they had struck with Defendant.

415.     Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the disclosure of Plaintiffs' and Class Members' Private Information to Google and Meta.

## COUNT FIVE

### NEGLIGENCE
### *(On behalf of Plaintiffs & the Nationwide Class)*

416.     Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

417.     Defendant required Plaintiffs and Class Members to submit non-public personal information in order to obtain healthcare services.

418.     Upon accepting, storing and controlling the Private Information of Plaintiffs and the Class in its computer systems, Defendant owed, and continues to owe, a duty to Plaintiffs and the Class to exercise reasonable care to secure, safeguard and protect their highly sensitive Private Information from disclosure to third parties.

419.     Defendant's duty of care to use reasonable measures to secure and safeguard Plaintiffs' and Class Members' Private Information arose due to the special relationship between Defendant and its patients, which is recognized by statute, regulations and common law.

98

420. In addition, Defendant had a duty under HIPAA privacy laws, which were enacted with the objective of protecting the confidentiality of clients' healthcare information and set forth the conditions under which such information can be used, and to whom it can be disclosed. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for, but to any entity that may have access to healthcare information about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the patient's finances or reputation.

421. Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1).

422. Some or all of the healthcare, medical, or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

423. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

424. Defendant's duty to use reasonable care in protecting confidential data arose also because Defendant is bound by industry standards to protect confidential Private Information.

425. Defendant breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

426. It was reasonably foreseeable that Defendant's failures to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' Private Information through its use

of the Meta Pixels and other tracking technologies would result in unauthorized third parties, such as Facebook and Google, gaining access to such Private Information for no lawful purpose.

427.    Defendant's own conduct also created a foreseeable risk of harm to Plaintiffs and Class Members and their Private Information.

428.    Defendant's misconduct included the failure to (i) secure Plaintiffs' and Class Members' Private Information; (ii) comply with industry standard data security practices; (iii) implement adequate website and event monitoring; (iv) implement systems, policies and procedures necessary to prevent unauthorized disclosures resulting from the use of the Meta Pixel, Google Analytics, Google DoubleClick Ads and other tracking technologies and (v) prevent unauthorized access to Plaintiffs' and Class Members' Private Information by sharing that information with Google, Meta and other third parties. Defendant's failures and breaches of these duties constituted negligence.

429.    As a direct result of Defendant's breach of its duty of confidentiality and privacy and the disclosure of Plaintiffs' and Class members' Private Information, Plaintiffs and the Class have suffered damages that include, without limitation, loss of the benefit of the bargain, increased infiltrations into their privacy through spam and targeted advertising they did not ask for, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

430.    Defendant's wrongful actions and inactions and the resulting unauthorized disclosure of Plaintiffs' and Class members' Private Information constituted (and continue to constitute) negligence under common law.

431. Plaintiffs and Class Members are entitled to compensatory, nominal and punitive damages, and Plaintiffs and Class Members are entitled to recover those damages in an amount to be determined at trial.

432. Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiffs and Class Members in an unsafe and unsecure manner. Therefore, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) cease sharing Plaintiffs' and Class Members' Private Information with Google, Meta and other third parties without Plaintiffs' and Class Members' express consent; and (iii) submit to future annual audits of its security systems and privacy monitoring procedures.

## COUNT SIX

### BREACH OF FIDUCIARY DUTY
### (*On Behalf of Plaintiffs & the Nationwide Class*)

433. Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

434. In light of the special physician-patient relationship between Defendant and Plaintiffs and Class Members, which was created for the purpose of Defendant providing healthcare to Plaintiffs and Class Members, Defendant became guardian of Plaintiffs' and Class Members' Private Information. Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs' and Class Members' Private Information; (2) to timely notify Plaintiffs and Class Members of an unauthorized disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

101

435.    Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendant' relationship with its patients and former patients, in particular, to keep secure their Private Information.

436.    Defendant breached its fiduciary duties to Plaintiffs and Class Members by disclosing their Private Information to unauthorized third parties, including Google and Meta, and separately, by failing to notify Plaintiffs and Class Members of this fact.

437.    As a direct and proximate result of Defendant' breach of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer injury and are entitled to compensatory, nominal and punitive damages, and disgorgement of profits, in an amount to be proven at trial.

## **COUNT SEVEN**

### **UNJUST ENRICHMENT**
### *(On behalf of Plaintiffs & Nationwide Class)*

438.    Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein, except for the paragraphs specifically regarding breach of contract.

439.    Plaintiffs plead this claim in the alternative to their breach of contract claim.

440.    Plaintiffs and Class Members personally and directly conferred a benefit on Defendant by paying Defendant for health care services, which included Defendant's obligation to protect Plaintiffs' and Class Members' Private Information. Defendant was aware of Plaintiffs' privacy expectations, and in fact, promised to maintain Plaintiffs' Private Information confidential and not to disclose to third parties. Defendant received payments for medical services from Plaintiffs and Class Members.

441.    Plaintiffs and Class Members also conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private.

442.    Defendant collected, used and disclosed this information for its own gain, including for advertisement, market research, sale or trade for valuable benefits from Facebook and other third parties.

443.    Defendant had knowledge that Plaintiffs and Class Members had conferred this benefit on Defendant by interacting with its Web Properties, and Defendant intentionally installed the Meta Pixel, Google Analytics and Google DoubleClick Ads on its Web Properties to capture and monetize this benefit conferred by Plaintiffs and Class Members.

444.    Plaintiffs and Class Members would not have used Defendant's Web Properties had they known that Defendant would collect, use and disclose this information to Facebook, Google and other third parties.

445.    The services that Plaintiffs and Class Members ultimately received in exchange for the monies paid to Defendant were worth quantifiably less than the services that Defendant promised to provide, which included Defendant's promise that any patient communications with Defendant would be treated as confidential and would never be disclosed to third parties for marketing purposes without the express consent of patients.

446.    The medical services that Defendant offers are available from many other health care systems that do protect the confidentiality of patient communications. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiffs' and Class Members' Private Health Information without consent, neither Plaintiffs, the Class Members, nor any reasonable person would have purchased healthcare from Defendant or its affiliated healthcare providers.

447.    By virtue of the unlawful, unfair and deceptive conduct alleged herein, Defendant knowingly realized hundreds of millions of dollars in revenue from the use of the Private Information of Plaintiffs and Classes Members for profit by way of targeted advertising related to Users' respective medical conditions and treatments sought.

448.    This Private Information, the value of the Private Information and the attendant revenue, were monetary benefits conferred upon Defendant by Plaintiffs and Class Members.

449.    As a result of Defendant's conduct, Plaintiffs and Class Members suffered actual damages in the loss of value of their Private Information and the lost profits from the use of their Private Information.

450.    It would be inequitable and unjust to permit Defendant to retain the enormous economic benefits (financial and otherwise) it has obtained from and at the expense of Plaintiffs and Class Members.

451.    Defendant will be unjustly enriched if it is permitted to retain the economic benefits conferred upon them by Plaintiffs and Class Members through Defendant's obtaining the Private Information and the value thereof, and profiting from the unlawful, unauthorized and impermissible use of the Private Information of Plaintiffs and Class Members.

452.    Plaintiffs and Class Members are therefore entitled to recover the amounts realized by Defendant at the expense of Plaintiffs and Class Members.

453.    Plaintiffs and the Class Members have no adequate remedy at law and are therefore entitled to restitution, disgorgement and the imposition of a constructive trust to recover the amount of Defendant's ill-gotten gains and other sums as may be just and equitable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs on behalf of themselves and the Proposed Class defined herein, respectfully request this Honorable Court to provide the following relief:

A. That this Action be maintained as a Class Action, that Plaintiffs be named as Class Representative of the Class, that the undersigned be named as Lead Class Counsel of the Class, and that notice of this Action be given to Class Members;

B. That the Court enter an order:

   1. Preventing Defendant from sharing Plaintiffs' and Class Members' Private Information among other third parties;

   2. Requiring Defendant to alert and otherwise notify all Users of its Web Properties of what information is being collected, used and shared;

   3. Requiring Defendant to provide clear information regarding its practices concerning data collection from the Users/patients of Defendant's Web Properties, as well as uses of such data;

   4. Requiring Defendant to establish protocols intended to remove all personal information which has been leaked to Facebook and other third parties, and request Facebook/third parties to remove such information;

   5. Requiring Defendant to provide an opt out procedures for individuals who do not wish for their information to be tracked while interacting with Defendant's Web Properties;

   6. Mandating the proper notice be sent to all affected individuals and posted publicly;

   7. Requiring Defendant to delete, destroy and purge the Private Information of Users unless Defendant can provide reasonable justification for the retention and use of such information when weighed against the privacy interests of Users;

   8. Requiring all further and just corrective action, consistent with permissible law and pursuant to only those causes of action so permitted.

C. That the Court award Plaintiffs and the Class Members damages (both actual damages for economic and non-economic harm and statutory damages) in an amount to be determined at trial;

D. That the Court issue appropriate equitable and any other relief (including monetary damages, restitution and disgorgement) against Defendant to which Plaintiffs and the

Class are entitled, including but not limited to restitution and an Order requiring Defendant to cooperate and financially support civil and criminal asset recovery;

E. Plaintiffs and the Class be awarded with pre- and post-judgment interest (including pursuant to statutory rates of interest set under State law);

F. Plaintiffs and the Class be awarded with the reasonable attorneys' fees and costs of suit incurred by their attorneys;

G. Plaintiffs and the Class be awarded with treble and punitive damages insofar as they are allowed by applicable laws; and

H. Any and all other such relief as the Court may deem just and proper under the circumstances.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a jury trial on all triable issues.

DATED: August 12, 2024                    Respectfully submitted,


/s/ David M. Wilkerson
David M. Wilkerson
N.C. Bar No. 35742
**THE VAN WINKLE LAW FIRM**
11 N Market Street
Asheville, NC 28801
(828) 258-2991
dwilkerson@vwlawfirm.com


/s/ David S. Almeida
David S. Almeida
(*pro hac vice* admission)
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue Chicago,
Illinois 60614
(312) 576-3024 (phone)
david@almeidalawgroup.com
*Attorneys for Plaintiffs*